# In the United States Court of Federal Claims

No. 07-744
Filed: March 18, 2008
**TO BE PUBLISHED**[*]

| | |
|---|---|
| INFORMATION SCIENCES CORP., Plaintiff, GALLAGHER, HUDSON, HUDSON & HUNSBERGER, INC. (d/b/a Development InfoStructure or DEVIS), Plaintiff-Intervenor, v. THE UNITED STATES, Defendant, SYMPLICITY CORPORATION, Defendant-Intervenor. | Administrative Procedure Act; 5 U.S.C. §§ 701, *et seq.*; "Best Value" Determination; "Competitive Range" Determination; Federal Acquisition Regulation 15.101, 15.208, 15.305(a), 15.306, 15.308, 15.404-1; 48 C.F.R. §§ 15.101, 15.208, 15.305(a), 15.306, 15.308, 15.404-1; Intervenor as a Matter of Right, RCFC 24(a); Jurisdiction; Motion for Judgment on the Administrative Record, RCFC 52.1; Permanent Injunction; Post-Award Bid Protest, 28 U.S.C. § 1491(b)(1); Price Realism Analysis; *Res Judicata*; RESTATEMENT (SECOND) OF CONTRACTS §§ 202(1), 203(c). |

**William A. Shook**, Kirkpatrick & Lockhart Preston Gates Ellis LLP, Washington, D.C., for Plaintiff.

**Gregg M. Schwind**, United States Department of Justice, Washington, D.C., for Defendant.

**Robert S. Ryland**, Kirkland & Ellis LLP, Washington, D.C., for Plaintiff-Intervenor.

**Richard L. Moorhouse**, Greenberg Traurig LLP, Washington, D.C., for Defendant-Intervenor.

## MEMORANDUM OPINION AND ORDER

[*] On March 7, 2008, a pre-publication draft of this Memorandum Opinion and Order was provided under seal to the parties. The parties were instructed to propose any redactions on or before close of business on March 13, 2008. On March 18, 2008, this Memorandum Opinion and Order was published with redactions, indicated by the designation "[deleted]." A non-redacted version also was filed under seal on that date with the Clerk of the United States Court of Federal Claims.

**BRADEN, *Judge*.**

On September 19, 2006, the court issued a Memorandum Opinion and Order setting aside an award of a Federal Business Opportunities Contract ("FBO Contract") to Symplicity Corporation ("Symplicity"), after determining that the General Services Administration ("GSA") violated Federal Acquisition Regulation ("FAR") 15.306(c) and 15.308. *See Info. Scis.* v. *United States*, 73 Fed. Cl. 70, 129 (2006) ("*Info. Scis. I*"). Specifically, the court held that GSA violated FAR 15.306(c), because the relevant Contracting Officer ("CO") did not consider price when establishing the competitive range, as required in the Solicitation. *Id.* at 114-16 (citing AR 254-55 (RFP § L.10)) ("[O]fferors are cautioned to submit proposals on the most favorable basis as to price, delivery, or time of completion and other factors[.]"); AR 258 (RFP § M.2) ("Price proposals . . . will be evaluated[.]"); AR 263-64 (RFP § M.6) ("[T]he Government will perform a price analysis."); *see also* AR 2387, 2538. In addition, the court held that GSA violated FAR 15.308, because the Source Selection Authority ("SSA") failed to exercise independent judgment and document that judgment in the Source Selection Decision. *See Info. Scis. I*, 73 Fed. Cl. at 118-20; *see also id.* at 120 ("In this case, the Administrative Record does not evidence that the SSA exercised independent judgment raising Symplicity's rating from 'Unacceptable' to 'Acceptable' and ISC's rating from 'Marginal' to 'Acceptable.'"). The court also held that the Plaintiff ("ISC") and Plaintiff-Intervenor ("DEVIS") were prejudiced, because each had a "substantial chance" of being awarded the FBO Contract, but for those violations. *Id.* at 116-18, 121-22. Accordingly, the court ordered GSA to appoint a new SSA to review the prior proposals, pursuant to FAR and the terms of the Solicitation, and to select the offeror for award that represents the "best value." *Id.* at 129.[1]

On October 24, 2007, ISC filed a Complaint to protest the September 28, 2007 re-award of the FBO Contract to Symplicity, alleging that GSA again violated FAR and/or acted without a rational basis in making the award. On October 26, 2007, DEVIS intervened to challenge that

---

[1] On October 3, 2006, the Government filed a motion requesting reconsideration of three aspects of the court's September 19, 2006 decision. On reconsideration, the court rejected the Government's argument that the court erred in determining that the SSA failed to document the exercise of independent judgment. *See Info. Scis.* v. *United States,* 75 Fed. Cl. 406, 410 (2007) ("*Info. Scis. II*") ("At no place in the GSA's Final Decision, did the SSA provide any independent analysis or rationale for endorsing the Minority Report's conclusions or how it considered and balanced/weighed the Majority Report."). Second, the court determined that the Government failed to establish "manifest error" in the court's conclusion that ISC and DEVIS were prejudiced by the CO's failure to consider price in establishing the competitive range. *Id.* at 411-12 ("The court's conclusion was based on two factors. [I]t was difficult to determine from Symplicity's initial price proposal the specific price Symplicity was proposing. [T]he CO's 'best guess' of Symplicity's proposed price was well below the average price of . . . the seven others bidders, [and] significantly lower than the Government's own cost-estimate[.]"). Third, the court rejected the Government's contention that, absent bad faith, the appointment of a new SSA was unnecessary. *Id.* at 413. The court explained that appointing a new SSA was less intrusive than ordering GSA to resolicit bids, but should ensure that ISC and DEVIS received a fair, unbiased evaluation of their proposals. *Id.*

award. On December 11, 2007, Symplicity also intervened and on January 3, 2008 filed a post-hearing motion to support GSA's September 28, 2007 re-award of the FBO Contract.

For the reasons discussed herein, the court has determined that ISC's Motion For Judgment On The Administrative Record and DEVIS's Motion For Judgment On The Administrative Record are granted, in part, by enjoining the September 28, 2007 re-award of FBO Contract No. GSOOT05NSC0005 to Symplicity and ordering GSA to issue a revised Solicitation and award.

To facilitate review of this Memorandum Opinion and Order, the court has provided the following outline:

**I. BACKGROUND.**

**A. On April 18, 2007, The Contracting Officer Issued A Reconsidered Competitive Range Determination.**

**B. On September 13, 2007, A New Source Selection Authority Issued A Revised Source Selection Decision.**

**II. PROCEDURAL HISTORY.**

**III. DISCUSSION.**

**A. Jurisdiction.**

**B. Standing.**

**1. Plaintiff Has Standing.**

**a. As An "Interested Party."**

**b. With A "Substantial Chance" Of Being Awarded The Contract.**

**2. Both Intervenors Have Standing.**

**C. The Effect of *Res Judicata* On Claims Asserted In This Bid Protest.**

**D. The Relevant Standards For Decision On The Administrative Record In A Bid Protest Case.**

**E. Motions For Judgment On The Administrative Record.**

**1. The Contracting Officer's April 18, 2007 Reconsideration Of Competitive Range Determination.**

a. **Did Not Violate FAR 15.306, In Not Conducting Additional Offeror Discussions.**

i. **Plaintiff's Argument.**

ii. **The Government And Defendant-Intervenor's Responses.**

iii. **The Court's Resolution.**

b. **Did Not Violate FAR 15.306, In Not Relying On The Price Evaluation Team's Analysis.**

i. **Plaintiff-Intervenor's Argument.**

ii. **The Government's Response.**

iii. **The Court's Resolution.**

c. **Did Not Violate FAR 15.306, In Correcting Defendant-Intervenor's Price Proposal.**

i. **Plaintiff-Intervenor's Argument.**

ii. **The Government And Defendant-Intervenor's Responses.**

iii. **The Court's Resolution.**

d. **Did Not Violate FAR 15.306, In Not Conducting A "Price Realism Analysis."**

i. **Plaintiff's Argument.**

ii. **Defendant-Intervenor's Response.**

iii. **The Court's Resolution.**

2. **The New Source Selection Authority's September 13, 2007 Source Selection Decision.**

a. **"Best Value" Analysis Did Not Comply With FAR 15.101 And FAR 15.308.**

i. **Plaintiff And Plaintiff-Intervenor's Arguments.**

ii. The Government And Defendant-Intervenor's Response.

iii. The Court's Resolution.

b. Complied With FAR 15.308, In Documenting The Exercise Of Independent Judgment.

i. Plaintiff And Plaintiff-Intervenor's Arguments.

ii. The Government And Defendant-Intervenor's Responses.

iii. The Court's Resolution.

F. Plaintiff And Plaintiff-Intervenor Are Entitled To Injunctive Relief.

1. Governing Precedent Regarding Relief In Bid Protest Cases.

2. The Requested Relief In This Case

3. The Court's Resolution.

a. Plaintiff And Plaintiff-Intervenor Have Demonstrated Success On The Merits As To The "Best Value" Determination.

b. Plaintiff And Plaintiff-Intervenor Have Established Irreparable Harm, If Injunctive Relief Is Not Granted.

c. In This Case, The Balance Of The Hardships Weighs In Favor Of Injunctive Relief.

d. In This Case, The Public Interest Weighs In Favor Of Injunctive Relief.

IV. CONCLUSION.

COURT APPENDIX: COMPARISON OF THE PRIOR MAY 26, 2005 AND JUNE 16, 2005 SOURCE SELECTION DECISION WITH THE SEPTEMBER 13, 2007 NEW SOURCE SELECTION DECISION

* * *

# I. BACKGROUND.[2]

## A. On April 18, 2007, The Contracting Officer Issued A Reconsidered Competitive Range Determination.

On April 18, 2007, the CO reconsidered the prior Competitive Range Determination for Solicitation No. TQN-04-RA-00. *See* AR 2540 (April 18, 2007 Competitive Range Determination). The CO relied on the proposals submitted to GSA on June 24, 2004, and existing technical evaluations, and did not consider any additional information. *See* AR 2543-46, 2586.

The CO's technical evaluation was conducted in three steps. *See* AR 2541-42. First, the proposals were evaluated under a "Requirements Audit Check," to ascertain whether they included all of the critical requirements specified in the RFP. *See* AR 2542 ("Ten critical parts were required in each offeror's proposal, and as a result of the Audit two proposals were eliminated from further competition."). Second, the remaining proposals were evaluated according to the technical factors listed in the RFP. *Id.* Third, the CO established a new competitive range, based on the ratings from the aforementioned evaluation. *Id.* ("[F]our offerors, Aquilent, DEVIS, ISC, and Symplicity, received a technical proposal adjectival rating of Acceptable/Confidence[.]"). Although price was an evaluation factor, the CO emphasized that the other technical evaluation factors were of greater importance. *See* AR 2543 ("The RFP . . . explains the relative importance of the evaluation factors, and specifically explains that all technical evaluation factors, when combined, are significantly more important than price and incentive plan.").

After the technical evaluation was completed, the remaining offerors' price proposals were evaluated for "realism, reasonableness[,] and an indication of compatibility between the proposed prices and the proposed scope and effort." *Id.* ("[T]he proposed prices from the four offerors . . . were considered in determining eligibility for inclusion in the competitive range."). The CO's analysis of the initial price proposals, however, "revealed that not all bidders provided proposals in the format that was requested." *See* AR 2544 ("All of these initial price proposals required varying degrees of clarification. [A]ll of the proposals lacked the detail required to complete a thorough price analysis.").

---

[2] The facts relating to the background of the Solicitation and prior bid protest are discussed fully in *Info. Scis.* v. *United States*, 73 Fed. Cl. 70 (2006) ("*Info. Scis. I*"). Additional facts recited herein were derived from: the Administrative Record ("AR" 2540-88); Plaintiff's November 12, 2007 Motion for Judgment On The Administrative Record ("Pl. Mot. II") and Plaintiff's Memorandum in Support ("Pl. Mem. II"); Plaintiff-Intervenor's November 26, 2007 Corrected Memorandum In Support of Motion For Judgment On The Administrative Record ("Int. Mem. II"); the Government's November 27, 2007 Cross Motion And Response To Judgment On The Administrative Record And Consolidated Opposition To Plaintiff's And Plaintiff-Intervenor's Motions For Judgment On The Administrative Record ("Gov't Resp. II"); Defendant-Intervenor's January 3, 2008 Post-Hearing Brief ("Def. Int. PH Br."); the Government's January 3, 2008 Post-Hearing Brief ("Gov't PH Br."); Plaintiff's February 4, 2008 Post-Hearing Brief ("Pl. PH Br."); and Plaintiff-Intervenor's February 4, 2008 Post-Hearing Brief ("Pl. Int. PH Br.").

The CO stated that he made a "clerical error" in determining that Symplicity's initial price proposal was $1,074,220. *See* AR 2545. The correct price should have been $12,044,563.[3] Issues requiring clarification regarding Symplicitiy's price proposal "were minor in nature and could easily be resolved in discussion." [4] *See* AR 2545.

The CO also found that DEVIS's initial price proposal required clarification,[5] but concluded that DEVIS's price, "as it related to its proposed solution, had an excellent chance of being determined realistic, fair, and reasonable, once these minor issues were clarified in discussions." AR 2546.

After reviewing ISC's price proposal, the CO also concluded that additional clarification was needed,[6] and that ISC's proposal also "had an excellent chance of being determined realistic, fair and reasonable, once these minor issues were clarified in discussions." *Id*. The CO determined that ISC's total price was [deleted]. *See* AR 2560 ("ISC's evaluated price should be reduced by [deleted], from [deleted] to [deleted] [,] because of the benefits of early implementation.").

On April 25, 2007, the CO sent letters to Aquilent, DEVIS, ISC, and Symplicity informing them that each was considered to be in the Competitive Range and that a new SSA had been appointed.[7] *See* AR 2549-55, 2559. The CO also requested that each of the offerors extend its proposal. *Id.* ("As a result of the court's direction, it is necessary to request an extension of your current proposal."). Offerors were instructed to reply and indicate the number of days that their proposals would be extended, but not to include any additional information. *Id.* ISC, Aquilent, and Symplicity extended their proposals for 180 days. *See* AR 2549-50, 2554. DEVIS's proposal was

---

[3] Subsequently, the CO also admitted that a second clerical error and "rounding up" resulted in a price that was about $600 less than the total price DEVIS's counsel calculated in adding all CLINs listed in Symplicity's price proposal: $12,045,191.81. *See* AR Tab 165 ¶ 7 (Jan. 3, 2008 Abood Decl.); *see also* Int. Ex. A (Symplicity Price Calculation Table).

[4] No discussions took place prior to the new SSA making the Source Selection Decision. *See* AR 2540-88.

[5] The CO, however, expressed the following concerns about DEVIS's price proposal: "[DEVIS's] issues included: providing evidence that all optional software had been priced; providing an explanation for the price increase in year 7; providing additional information on teaming arrangements, and identifying pricing associated with hardware refresh." AR 2546.

[6] Clarifications regarding ISC's price proposal included: "further explanation regarding its $0.00 charge for developing FedTeds; clarifying its use of the phrase 'task orders and costs;' providing additional supporting price documentation; providing additional information on teaming arrangements; and identifying pricing associated with hardware refresh." AR 2546.

[7] The new SSA was Mr. Michael Sade, GSA's Assistant Commissioner, Office of Acquisition Management, Federal Acquisition Service. *See* Def. Int. PH Br. at 19 (citing AR 2562).

extended for 244 days. *See* AR 2552. GSA had no further contact with the offerors until the SSA issued the revised Source Selection Decision. *See* AR 2587.

### B. On September 13, 2007, A New Source Selection Authority Issued A Revised Source Selection Decision.

On September 13, 2007, the new SSA issued a revised Source Selection Decision. *See* AR 2559-62 (Sept. 13, 2007 Source Selection Decision). Therein, the new SSA represented that he personally reviewed the "Acquisition Plan, Source Selection Evaluation Plan, Solicitation, Proposals, Majority, Minority, and Independent [Technical] Evaluation Reports, Competitive Range Determination, Price Evaluation, the Reconsideration of the Competitive Range Determination, and the Court of Federal Claims decision." AR 2559. The SSA also determined that the final ratings and adjusted prices for each proposal were reasonable. *See* AR 2559-61. To his credit, the SSA admitted that the CO provided assistance in preparing the final Source Selection Decision, but stated that the "opinions, judgments, and tradeoffs" were his own. *See* AR 2559.

The new SSA found that Aquilent's proposal had the "lowest technical ratings and highest price," and did not represent the "best value" to the Government. *See* AR 2560-61 ("The Aquilent proposal was uniformly rated as technically "Marginal" in all three evaluations. Moreover, the Aquilent price was by far the highest of all four offers in the competitive range. The combination of the technical evaluation ratings and price removes the proposal from further consideration[.]").

Next, in comparing the strengths and weaknesses of DEVIS's proposal, the new SSA found that:

> DEVIS was the only technical proposal where there was a consensus of excellent or acceptable on all evaluation factors . . . . The Majority, Minority, and Mitretek evaluations judged the DEVIS proposal to be technically superior to the other three proposals in the competitive range . . . . However, both the Minority and Mitretek evaluations noted a number of weaknesses and disadvantages associated with the DEVIS proposal. With respect to the price of the DEVIS proposal, the contracting officer has previously determined that DEVIS' evaluated price should be reduced by [deleted] . . . because of a benefit of early implementation.

AR 2560.

The new SSA also found that DEVIS's proposal presented attractive options, but ultimately determined that those benefits were not worth the additional cost. *See* AR 2561 ("However, in my judgment there is no reasonable basis for spending an additional [deleted], much less an additional [deleted], for the technical strengths of the DEVIS proposal . . . . For these reasons, the DEVIS proposal does not represent the best value to the government.").

Next, the new SSA compared ISC's and Symplicity's proposals, giving additional weight to the price analysis, because he found that both offerors received "similar technical adjectival ratings."

*Id.* ("According to the RFP, provision M.2, the price analysis takes on more importance because ISC and Symplicity both received similar technical adjectival ratings."). The new SSA summarized his analysis of ISC's proposal as:

> rated 'Marginal' with 'Confidence' by the Majority, 'Acceptable' with 'Confidence' by the Minority, and 'Acceptable' by the independent Mitretek evaluator . . . . I have carefully reviewed the strengths and weaknesses of the ISC proposal identified by all evaluators. Because the Minority and Mitretek reports are consistent with respect to the rating of "Acceptable" and are more focused on the governments (sic) needs as reflected in the RFP requirements, it is my judgment that the Minority and Mitretek reports more accurately assess the ISC proposal. Therefore, I determine that the ISC proposal is 'Acceptable' with 'Confidence.' [T]he contracting officer has previously determined that ISC's evaluated price should be reduced by [deleted] because of the benefits of early implementation . . . . I find this adjustment reasonable.

*Id*.

Then, the new SSA:

> carefully reviewed the strengths and weaknesses of the Symplicity proposal identified by the evaluators and the responses to identified weaknesses in the Minority report. The Minority and Mitretek reports are consistent with respect to strengths and weaknesses and their ultimate rating of 'Acceptable' . . . . The strengths of the Symplicity proposal more than outweigh any remaining identified weaknesses in the proposal. It is my judgment that the Minority and Mitretek assessments [are] more accurate, and should be given more weight than the Majority evaluation. Therefore, it is my judgment that the Symplicity proposal is 'Acceptable' with 'Confidence.'

*Id.*

The new SSA concluded that the strengths of ISC's proposal were:

> experience as the incumbent subcontractor, a proposal for early implementation, strong interagency coordination, plans for maintaining existing and familiar interfaces, partnering with IMSI for certification and accreditation process, maximizing return on investment in the current FBO, understanding of issues associated with the software development life cycle, approach to delivering software, management and key personnel[.]

*See* AR 2561-62. He found, however, that "the technical strengths of the ISC proposal [were] not worth an additional [deleted]" and did not "outweigh the strengths, innovative approach, and lower price of the Symplicity proposal, and the Government will not receive [deleted] in benefits from ISC." AR 2562.

The new SSA also concluded that "Symplicity [had] proposed an innovative approach, many enhancements over the existing system, and a program that will lower the costs of operation," and selected the proposal as representing the "best value" for the Government. *See id*. ("Symplicity offers an innovative and qualitatively comparable technical solution that fulfills the Government's requirements at a significantly lower price.").

On September 28, 2007, the CO notified all "Competitive Range" offerors that the new SSA re-awarded the FBO contract to Symplicity. *See* AR 2565-68 ("In accordance with the court's decision, the competitive range was reconsidered by the Contracting Officer, and a new Source Selection Authority was appointed. As a result, the SSA has selected Symplicity corporation as representing the best value to the government."). The CO also offered to debrief the offerors not selected. *See* AR 2565-66, 2568 ("If you would like a debriefing, please provide a written request[.]").

On October 12, 2007, GSA provided DEVIS with a debriefing. *See* Int. Mot. II Att. 1 (Oct. 12, 2007 Response to Written Questions). DEVIS questioned the new SSA's conclusion which found the Symplicity proposal was "Acceptable with [C]onfidence." *Id.* at 1. DEVIS was advised that the new competitive range determination was based on the "rating of each proposal against all evaluation criteria." *Id.* DEVIS also asked whether new information was considered, other than that provided with the initial proposals. *Id*. GSA responded that no new information was received. *Id.* All bidders received the same May 27, 2007 notice letter. *Id.* No additional contact was had with any bidders other than the competitive range notification. *Id.* The new SSA also relied on the existing technical evaluations. *Id.* at 2.

On October 15, 2007, GSA provided ISC with a debriefing. *See* AR 2569-70. In addition, GSA responded to ISC's written questions. *See* AR 2585. GSA confirmed that ISC's June 24, 2004 proposal was reconsidered for the "Competitive Range Determination" and that ISC's final technical proposal was used to evaluate the "technical aspects of [the] proposal." AR 2586 (Oct. 15, 2007 Responses to Written Questions). In response to ISC's inquiry regarding any past performance weaknesses, GSA responded that the only weaknesses identified were those discussed in the debriefing. *Id.* ("There were no significant weaknesses associated with ISC's proposal, other than what is stated in the Past Performance debriefing slide."); *see also* AR 2582 (ISC Past Performance Debriefing Slide) (identifying no weaknesses). GSA also stated that the strengths and weaknesses identified in ISC's proposal were based on the new SSA's review of "existing evaluation documents." AR 2586. GSA declined to provide ISC with suggestions as to how ISC could have improved the risk rating to the highest level of confidence, other than to reiterate that the debriefing slides stated the significant strengths and weakness of the proposal. *Id.* In response to ISC's inquiry as to when past performance was evaluated, GSA stated that all "past performance information was evaluated prior to the finalization of technical evaluation reports." *Id.* GSA also stated that the letters asking the offerors to extend the validity of their proposals were the last communication prior to the new SSA's final decision. AR 2587.

## II. PROCEDURAL HISTORY.

On October 24, 2007, ISC filed a Complaint, together with a Motion And Memorandum For Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction, challenging the September 28, 2007 re-award of the FBO contract to Symplicity. On October 25, 2007, the court was informed that DEVIS would file a Motion To Intervene, protesting the re-award. On October 26, 2007, the court convened a status conference, but declined to issue a temporary restraining order or preliminary injunction. On that same date, the court granted DEVIS's Motion to Intervene, and entered a Protective Order and Scheduling Order for the filing of dispositive motions and convening oral argument.

On November 1, 2007, the Government filed the Administrative Record ("AR" 2540-88).[8] On November 12, 2007, ISC filed a Motion For Judgment On The Administrative Record, together with a Memorandum In Support ("Pl. Mem. II"), Statement Of Facts, Attachment ("Att. 1"), and Proposed Order. On that same date, DEVIS filed a Motion For Judgment On The Administrative Record ("Int. Mot. II"), together with a Memorandum In Support, Attachment ("Att. 1") (Oct. 12, 2007 DEVIS Post-Award Debriefing Questions and Responses), and Proposed Order.

On November 14, 2007, ISC filed an Amended Complaint ("Am. Compl."). On November 26, 2007, DEVIS filed a Corrected Memorandum In Support Of Motion For Judgment On The Administrative Record ("Int. Mem. II"). On November 27, 2007, the Government filed a Response To Plaintiff And Plaintiff-Intervenor's Motion For Judgment On The Administrative Record ("Gov't Resp. II"). On November 29, 2007, the court held oral arguments on all pending motions ("11/29/07 TR"). On that occasion, the Government introduced a November 29, 2007 Declaration of Mr. Robert Abood, the Contracting Officer ("Nov. 29, 2007 Abood Decl."), in addition to adding Symplicity's price proposal to the Administrative Record ("AR Tab 158").

On November 30, 2007, the court entered a Scheduling Order for the filing of post-hearing briefs and responses. On December 3, 2007, the court entered a Discovery Order, requiring the Government to submit copies of the current FBO System Contract Modification with Symplicity to ISC and DEVIS on or before December 10, 2007.

On December 3, 2007, Symplicity filed a Motion To Intervene. On December 7, 2007, ISC filed a Motion For Reconsideration Of Plaintiff's Motion For Preliminary Injunction ("Pl. Mot. Recon."), together with a December 7, 2007 Declaration of Mr. Gregory Portnoy, ISC's President ("Dec. 7, 2007 Portnoy Decl."). In effect, that motion sought an injunction to protect ISC from having to supply Symplicity with ISC's proprietary information. *See* Pl. Mot. Recon. at 3-4; *see also* AR Tab 162 ¶¶ 3-5 (Dec. 7, 2007 Portnoy Decl.). On December 10, 2007, DEVIS filed a Declaration of Mr. Edward Meyers, Attorney at Kirkland & Ellis LLP ("Dec. 10, 2007 Meyers Decl."), together with Intervenor Exhibit A ("Int. Ex. A") (Symplicity Price Calculation Table).

---

[8] The Administrative Record of the prior bid protest of the award of the FBO Contract to Symplicity is found at AR 1-2539.

On December 11, 2007, the court convened a status conference. On that same date, the court entered an Order granting Symplicity's Motion To Intervene and an Order subjecting Symplicity to the October 26, 2007 Protective Order. The court also entered a Discovery Order requiring the Government to submit copies of any and all past, current and future FBO System Contract Modifications with Symplicity through the pendency of this case. On December 13, 2007, the court convened a status conference. On December 20, 2007, DEVIS filed a Motion To Unseal The Proposed Redacted Copy of Symplicity's Contract Modification PS02, together with 9 exhibits[9] and a Proposed Order. On December 21, 2007, ISC filed a Motion For Leave To File Second Amended Complaint, together with a Second Amended Complaint ("Sec. Am. Compl."), Application for Temporary Restraining Order, Motion for Preliminary and Permanent Injunction, Exhibit Attachments, a Proposed Temporary Restraining Order, and a Proposed Order On Motion For Preliminary Injunction.

On January 3, 2008, Symplicity filed a Post-Hearing Brief ("Def. Int. PH Br."), together with a January 3, 2008 Declaration of Robert Abood ("Jan. 3, 2008 Abood Decl."). On that date, the Government filed a Post-Hearing Brief ("Gov't PH Br."). On January 7, 2008, Symplicity filed a Response To Plaintiff's Motion For Leave To File Second Amended Complaint. On that date, the Government also filed a Response To Plaintiff's Motion For Leave To File Second Amended Complaint. On January 14, 2008, ISC filed a Motion For Reconsideration Of Plaintiff's Motion For Preliminary Injunction, Or, In The Alternative, Second Motion For Preliminary Injunction ("Pl. Mot. Recon. II"). This motion argued that the Government's renewed request for ISC's proprietary information created a change of circumstances causing ISC irreparable injury. *See* Pl. Mot. Recon. II at 2-6. On January 18, 2008, ISC and DEVIS filed a Corrected Reply To The Government's January 7, 2008 Response To Plaintiff's Motion For Leave To File Second Amended Complaint.

On January 22, 2008, the Government filed a Response to Plaintiff-Intervenor's Motion To Unseal The Proposed Redacted Copy of Symplicity's Contract Modification PS02 and a Motion For Leave To File Sur-Reply. On January 24, 2008, the court granted the Government's Motion For Leave To File Sur-Reply. On January 31, 2008, the Government filed a Response to Plaintiff's Motion For Reconsideration Of Plaintiff's Motion For Preliminary Injunction, Or, In The Alternative, Second Motion For Preliminary Injunction. On that same date, DEVIS filed a Reply To The Government's Response To Plaintiff-Intervenor's Motion To Unseal The Proposed Redacted Copy of Symplicity's Contract Modification PS02.

On February 4, 2008, ISC filed a Post-Hearing Brief ("Pl. PH Br."), together with two additional exhibits ("Pl. PH Br. Ex. 1, 2") (Nov. 8, 2007 "PS02" Modification of Contract) (Feb. 1, 2008 Letter from FAS Commissioner). On that date, DEVIS also filed a Post-Hearing Brief ("Pl. Int. PH Br."). On February 14, 2008, ISC filed a Reply To The Government's Response To

[9] These exhibits include: Nov. 8, 2007 Modification Of Contract Document; Dec. 11, 2007 e-mail to Mr. Gregg Schwind; Dec. 11, 2007 e-mail to Mr. Robert Ryland; Dec. 12, 2007 e-mail to Mr. Gregg Schwind; Dec. 12, 2007 e-mail to Mr. Robert Ryland; Dec. 13, 2007 e-mail to Mr. Gregg Schwind; Dec. 14, 2007 e-mail to Mr. Robert Ryland; Dec. 17, 2007 e-mail to Mr. Robert Ryland; and Dec. 17, 2007 e-mail to Mr. Gregg Schwind.

Plaintiff's Motion For Reconsideration Of Plaintiff's Motion For Preliminary Injunction, Or, In The Alternative, Second Motion For Preliminary Injunction, together with 8 additional exhibits.[10]

On February 21, 2008, the Government filed a Response To Plaintiff And Plaintiff-Intervenor's Post-Hearing Brief ("Gov't Resp. Pl. PH Br."). On that date, the court issued an Order advising the parties that the briefing period would close on February 27, 2008. On February 25, 2008, Symplicity filed a Response To Plaintiff's February 4, 2008 Reply, together with a February 23, 2008 Affidavit of Mr. Ariel M. Friedler*,* President of Symplicity ("Feb. 23, 2008 Friedler Aff.").

On March 4, 2008, the court granted Plaintiff's December 21, 2007 Motion For Leave To File Second Amended Complaint. On that date, Plaintiff filed the Second Amended Complaint ("Sec. Am. Compl.").

## III. DISCUSSION.

### A. Jurisdiction.

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, § 12(a), (b), 110 Stat. 3870 (1996), authorizes the United States Court of Federal Claims to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see also Banknote Corp. of Am.* v. *United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("The [United States] Court of Federal Claims has jurisdiction to review both pre-award and post-award bid protests pursuant to 28 U.S.C. § 1491(b), enacted as part of the Administrative Dispute Resolution Act of 1996[.]").

The Second Amended Complaint alleges that the Government violated numerous provisions of FAR in re-awarding the FBO contract to Symplicity. *See* Sec. Am. Compl. ¶ 49 ("Accordingly, ISC protests any award under Solicitation Number TQN-04-RA-0001 as contrary to regulation, unreasonable, unsupported by the facts, and an abuse of GSA's discretion."). These allegations recite a sufficient basis for the court to exercise jurisdiction, pursuant to 28 U.S.C. § 1491(b)(1).

### B. Standing.

As a threshold matter, a protester must establish that it is an "interested party." 28 U.S.C. § 1491(b)(1). The United States Court of Appeals for the Federal Circuit has interpreted the term

[10] These exhibits include: Dec. 3, 2007 memo from Mr. Richard Clark; Dec. 11, 2007 Status Conference Transcript; Dec. 13, 2007 e-mail from Mr. Robert Abood; Dec. 31, 2007 e-mail from Mr. Richard Clark; Dec. 20, 2007 e-mail from Mr. Greg Portnoy; Jan. 4, 2008 e-mail from Mr. Richard Clark; undated e-mail from Mr. Greg Portnoy, quoting Jan. 8, 2008 e-mail from Richard Clark; and undated e-mail from Mr. Greg Portnoy, quoting Feb. 7, 2008 e-mail from Ms. Wendy Gosnell.

"interested party" as defined in the Competition in Contracting Act, 31 U.S.C. § 3551.[11] *See Rex Serv. Corp.* v. *United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) ("[T]he term 'interested party' in section 1491(b)(1) is construed in accordance with the Competition in Contracting Act[.]"); *see also Banknote Corp.*, 365 F.3d at 1352 (holding that the United States Court of Federal Claims' jurisdiction under the Tucker Act, as amended, is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract"). The court applies a two-part test to determine whether a protester is an "interested party," *i.e.*, the protestor must show that it was an *actual or prospective bidder* and the protester must have a *direct economic interest* in the procurement. *See Rex Serv. Corp.*, 448 F.3d at 1307 ("[T]o come within the [United States] Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction, [the protester] is required to establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest.") (citations omitted).

In addition to establishing status as an "interested party," a protestor also must show that any alleged errors resulted in "prejudice." *See Galen Med. Assocs.* v. *United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("To prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it.") (quoting *Data Gen. Corp.* v. *Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (alterations in original)); *see also Myers Investigative & Sec. Servs., Inc.* v. *United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("[P]rejudice (or injury) is a necessary element of standing."). The United States Court of Appeals for the Federal Circuit has advised that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached *before* addressing the merits." *Info. Tech. & Applications Corp.* v. *United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (emphasis added); *see also Myers*, 275 F.3d at 1369 ("standing is a threshold jurisdictional issue[.]") (citations omitted).

The United States Court of Appeals for the Federal Circuit has held that a protestor can establish prejudice by showing a "substantial chance" that it would have received the award, but for the alleged error. *See Bannum, Inc.* v. *United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) ("To establish prejudice Bannum was required to show that there was a 'substantial chance' it would have received the contract award but for . . . errors in the bid process."); *see also Statistica, Inc.* v. *Christopher*, 102 F.3d 1577 (Fed. Cir. 1996) ("To establish competitive prejudice, a protestor must demonstrate that but for the alleged error, there was a '*substantial chance*' that [it] would receive an award-that is was within the zone of active consideration.") (internal citations omitted) (emphasis and alterations in the original). Panels of the United States Court of Appeals for the Federal Circuit, however, have differed with respect to the evidence required to satisfy the "substantial chance" test in a bid protest case. *Compare Info. Tech. & Applications*, 316 F.3d at 1319 (a protestor must establish that its chance of winning the award is greater than insubstantial), *with Alfa Laval Separation, Inc.* v. *United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (holding that a protester is not required to show that, but for the alleged error, the protester would have been

---

[11] The term "'interested party,' with respect to a contract or a solicitation or other request for offers described in 28 U.S.C. § 1491(b)(1) requires . . . an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract[.]" 31 U.S.C. § 3551(2)(A).

awarded the contract; instead a protester must show there was a 'substantial chance' it would have received the contract but for the alleged error), *with Data Gen.*, 78 F.3d at 1562-63 (holding "the appropriate standard is that, to establish prejudice, a protestor must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protestor would have been awarded the contract."). Our appellate court, however, has advised against placing undue weight on these semantic differences: "Rather than engage in verbal gymnastics, however, suffice it to say that *Data General* did not, *as it could not*, replace the "substantial chance" standard with a more demanding one." *Statistica*, 102 F.3d at 1582 (emphasis added); *see also Myers*, 275 F.3d at 1370 ("[T]he substantial chance rule continues to apply[.]").

Therefore, prejudice turns, in part, on the relationship between the protestor(s) and the specific procurement process that is being challenged, as well as the type of relief sought:

> In *Impresa* [*Construzioni Geom. Domenico Garufi* v. *United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001),] we considered the standard to be applied where the plaintiff claims that the government was obligated to rebid the contract (as contrasted with a situation in which the plaintiff claims that it should have received the award in the original bid process) . . . . To have standing, the plaintiff need only establish that it could compete for the contract if the bid process were made competitive . . . . plaintiff *need not* show that it would have received the award in competition with other hypothetical bidders, [but rather] must show that it would have been a qualified bidder.

*Myers*, 275 F.3d at 1370-71 (emphasis added) (citations omitted); *see also Alfa Laval*, 175 F.3d at 1367 ("[T]o establish competitive prejudice, [the] protestor must demonstrate that but for the alleged error, there was a substantial chance that [it] would receive an award - *that it was within the zone of active consideration.*") (emphasis added) (citation omitted).

**1. Plaintiff Has Standing.**

The Government continues "to challenge the standing of ISC . . . to contest the competitive range determination where, as here, both offerors' proposals were included." Gov't Resp. II at 10 n.1; *see also* Gov't PH Br. at 20-22.

**a. As An "Interested Party."**

ISC submitted a proposal in response to the initial Solicitation that was determined to be within the competitive range. *See* AR 2548. The four offerors in the competitive range proceeded to the "best value" determination. *See* AR 2559. Therefore, the Government's decision to award the contract to Symplicity directly affects the economic interests of ISC, the incumbent contractor. Accordingly, ISC is an "interested party." *See* 28 U.S.C. § 1491(b)(1); *see also Am. Fed'n Gov't Employees* v. *United States*, 258 F.3d 1294,1302 (2001) ("[W]e hold that standing under [28 U.S.C.] § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.").

**b. With A "Substantial Chance" Of Being Awarded The Contract.**

As discussed above, the "substantial chance" test depends on the procurement context. The FBO procurement was a "best value" contract, based on both technical considerations and price. *See* AR 2559-62. ISC and Symplicity were considered the two best proposals, but the SSA ultimately awarded the contract to Symplicity. *See* AR 2561. Therefore, ISC established that it had a "substantial chance" of being awarded the contract and has standing. *See* RCFC 24(a); *see also Myers*, 275 F.3d at 1370; *Am. Mar. Transp., Inc.* v. *United States*, 870 F.2d 1559, 1561 (Fed. Cir. 1989) (holding that "the requirements for intervention are to be construed in favor of intervention.").

**2. Both Intervenors Have Standing.**

On October 26, 2007, the court granted DEVIS's Motion to Intervene, pursuant to United States Court of Federal Claims Rule ("RCFC") 24(a). The Government, however, asserts that DEVIS does not have standing to challenge the new SSA's Source Selection Decision. *See* Gov't Resp. II at 29. The Government maintains that DEVIS cannot establish prejudice, because ISC, not DEVIS, "followed Symplicity in the order of proposals that represented the best value to the Government," *i.e.*, "even if the errors in [the SSA] evaluation alleged by DEVIS were corrected, the DEVIS proposal would not be within the zone of active consideration for award." *Id*. at 31.[12]

DEVIS counters that it has standing, because it has established a "direct economic interest." *See* Pl. Int. PH Br. at 4-5; *see also Info. Scis. I*, 73 Fed. Cl. at 93. In addition, the hierarchy set forth in the revised Source Selection Decision would have "'no weight' if DEVIS is correct that this SSA repeated the same mistakes as the first SSA." Pl. Int. PH Br. at 4-5; *see also* 11/29/07 TR at 75 (GOVERNMENT COUNSEL: "Even if the Court were to agree with that, say, you're right, DEVIS, the source selection authority got it wrong, that still puts DEVIS number two behind ISC." THE COURT: "No, it doesn't, because the source selection authority's second round of opinion would have no weight [if it also violated FAR provisions]."). Indeed, "[g]iven the fact that the RFP stated that the SSA should have accorded more weight to the technical ratings," which were higher for DEVIS than for the competing offerors, "an evaluation compliant with the RFP would likely have resulted in an award to [DEVIS]." Pl. Int. PH Br. at 5. Accordingly, DEVIS also has established that it has a "substantial chance" of being awarded the FBO contract. *See* RCFC 24(a); *see also Myers*, 275 F.3d at 1370; *Am. Mar. Transp.*, 870 F.2d at 1561.

---

[12] *See* AR 2561 (Sept. 13, 2007 Source Selection Decision) ("As discussed above, DEVIS's proposal is technically superior to the other proposals in the competitive range. However, the price of the DEVIS proposal is [deleted] more than ISC and [deleted] more than Symplicity. The value to the government of the strengths of DEVIS's proposal does not warrant the price differential when compared to other offerors . . . . [I]n my judgment, there is no reasonable basis for spending an additional [deleted], much less an additional [deleted], for the technical strengths of the DEVIS proposal . . . . For these reasons, the DEVIS proposal does not represent the best value to the government. Because I have eliminated DEVIS and Aquilent as not representing the best value to the government, the award decision is between ISC and Symplicity proposals, both of which I determined to be 'Acceptable' with 'Confidence.'").

On December 11, 2007, the court granted Symplicity's December 3, 2007 Motion to Intervene, with the consent of all parties. *See* RCFC 24(a); *see also* 12/11/07 TR at 3-4.

### C. The Effect of *Res Judicata* On Claims Asserted In This Bid Protest.

The Government asserts that the doctrine of *res judicata* bars ISC from re-litigating the SSA's inclusion of proposed options in evaluating ISC's price proposal, because the court rendered a final judgment on the merits of this issue in *Information Sciences I*. *See* Gov't Resp. II at 28 (citing *Info. Scis. I*, 73 Fed. Cl. at 109) ("Since the SSA modified the Price Proposals of every offeror, ISC's argument that it was singled out for unfair treatment, is not supported by the Administrative Record."). Regarding this issue, the Government contends that ISC's Second Amended Complaint satisfies every element for *res judicata* to apply. *See* Gov't Resp. II at 28-29 ("First, the same party, ISC, brought both suits. Second, the first suit proceeded to a final judgment on the merits, and the court held that GSA's evaluation of ISC's price proposal had a rational basis; that 'GSA did not abuse its discretion by considering ISC's proposed options;' and that 'ISC's enhancements were within option years, requiring GSA to exercise those options in order to receive full performance from ISC . . . . Third, ISC's current [Second Amended] complaint is virtually identical to its complaint in the previous protest [.]"). *See Federated Dept. Stores, Inc.* v. *Moitie*, 452 U.S. 394, 398 (1981) ("A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.").

The Government also maintains that *res judicata* bars DEVIS from challenging the CO's determination that Symplicity's price was invalid, because this argument "could have [been] raised, and therefore should have [been] raised . . . at the prior protest in this case." Gov't PH Br. at 3-4 (citing *Lowe* v. *United States*, 79 Fed. Cl. 218, 228 n.12 (2007) (quoting *Migra* v. *Warren City School Dist. Bd. of Educ*., 465 U.S. 75, 77 n.1 (1984) ("Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit. Claim preclusion therefore encompasses the law of merger and bar.")). Issues concerning Symplicity's initial price proposal and the CO's actions relating thereto were known, or should have been known, in the prior protest so that DEVIS's price challenges are barred. *Id*. at 4.

*Res judicata* applies when: the parties are identical or in privity; the first suit proceeded to a final judgment on the merits; and the second claim is based on the same set of transactional facts as the first. *See Parklane Hosiery Co., Inc.* v. *Shore*, 439 U.S. 322, 326 n.5 (1979). In *Information Sciences I*, the court determined that "the Solicitation specified that option years would be included within the price analysis[, and that therefore], GSA did not abuse its discretion by considering ISC's proposed options." *Info. Scis. I*, 73 Fed. Cl. at 109. Moreover, "since the SSA modified the Price Proposals of every offeror, ISC's argument that it was singled out for unfair treatment, is not supported by the Administrative Record." *Id.* Because the court previously has determined that the GSA's inclusion of ISC's non-mandatory options was rational, *res judicata* bars this claim.

The Government's invocation of *res judicata* regarding DEVIS's challenge of the CO's calculation of Symplicity's price, however, is without merit. Even though *Information Sciences I* concerned the same Solicitation and price proposals as in the instant case, the claim here is different,

because it challenges the CO's actions in reconsidering the Competitive Range Determination, and therefore is not based on the same set of transactional facts as the prior litigation. *See Parklane*, 439 U.S. at 326 n.5 (*Res judicata* applies where the parties are identical or in privity; the first suit proceeded to a final judgment on the merits; and the second claim is based on the *same set of transactional facts* as the first.) (emphasis added). In the initial Competitive Range Determination, the CO did not consider price at all. *See Info. Scis. I*, 73 Fed. Cl. at 115. Therefore, the court did not adjudicate that issue which is now ripe in this bid protest, *i.e.*, whether the CO violated FAR 15.306 in considering Symplicity's price proposal to be $12,044,563, instead of $1,074,022 or [deleted], depending on how Symplicity's price proposal was interpreted.

**D. The Relevant Standards For Decision On The Administrative Record In A Bid Protest Case.**

Pursuant to the Tucker Act, as amended by the ADRA, the United States Court of Federal Claims reviews challenges to agency decisions, pursuant to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]").

The United States Court of Appeals for the Federal Circuit has held that "a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Galen Med. Assocs.,* 369 F.3d at 1329 (citations omitted); *see also Bannum,* 404 F.3d at 1351 (holding that trial courts initially must determine if the Government "acted without rational basis or contrary to law when evaluating the bids and awarding the contract."); *Banknote Corp.*, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citation omitted).

A "disappointed bidder" bears a "heavy burden" of showing that an award decision had no rational basis. *See Impresa Construzioni Geom. Domenico Garufi* v. *United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001). This burden is even greater when the procurement is a "best value" procurement, as is the case here. *See Galen Med. Assocs.*, 369 F.3d at 1330 ("[A]s the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion . . . the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted); *see also Unisys Corp.* v. *Widnall*, 98 F.3d 1325, 1327 (Fed. Cir. 1996) ("In determining whether the agency has complied with the regulation authorizing best value procurement the [reviewing authority] may overturn an agency's decision if it is not grounded in reason.").

Accordingly, when the court finds a "reasonable basis" for an agency's action, the court should "stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc.* v. *United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (citation omitted); *see also*

*United States* v. *John C. Grimberg Co.*, 702 F.2d 1362, 1372 (1983) (holding that the court may interfere with a Government procurement process "only in extremely limited circumstances"). This standard recognizes a zone of acceptable results in each particular case, but requires that the agency's final decision be the result of a process that "consider[s] the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co.* v. *Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Impresa*, 238 F.3d at 1333-34 ("[T]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.") (citation & internal quotations omitted).

If a trial court finds that an agency's decision-making violates the APA standard, the court must then determine whether the bidder was prejudiced by the Government's action. *See Bannum*, 404 F.3d at 1351; *see also Impresa*, 238 F.3d at 1333 ("When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'") (citations omitted). Only if both requirements are satisfied will a claim on the merits of a bid protest succeed. *Bannum*, 404 F.3d at 1351; *see also Galen Med. Assocs.*, 369 F.3d at 1330 ("'[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.'") (quoting *Data Gen.*, 78 F.3d at 1562) (alterations in original). Prejudice thus requires that the protestor show a "substantial chance" that it would have received the contract award, but for "errors in the bid process." *See Bannum*, 404 F.3d at 1358; *see also Metcalf Constr. Co., Inc.* v. *United States*, 53 Fed. Cl. 617, 622 (2002) ("[M]inor errors or irregularities, *i.e.*, *harmless errors*, committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision.") (emphasis added).

Not every violation of the APA requires an equitable remedy. *See PGBA*, *LLC.* v. *United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004) ("We thus hold that, in a bid protest action, section 1491(b)(4) does *not* automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award.") (emphasis added). In *PGBA*, the United States Court of Appeals for the Federal Circuit affirmed the United States Court of Federal Claim's determination that a protestor's claim for injunctive relief should be denied on "public interest grounds," even though the plaintiff established prejudicial error in the underlying procurement. *Id.* at 1223 ("TMA had made several prejudicial errors in its evaluation of the technical merits of PGBA's and WPS's proposals . . . [however,] the [United States Court of Federal Claims] concluded that the balance of hardships and the public interest favored allowing TMA and WPS to proceed with the contract."). The United States Court of Appeals for the Federal Circuit concluded that "there is no evidence that Congress intended to abolish the tradition of equitable discretion in issuing injunctive relief when it enacted section 1491(b)(4) in ADRA." *Id.* at 1227; *see also id.* at 1226 ("This construction is consistent with the language of 28 U.S.C. § 1491(b)(2), which, through use of the permissive 'may,' provides the United States Court of Federal Claims with discretion in fashioning relief."). Therefore, a procurement error does not necessarily require equitable relief, but requires the trial court to decide whether to issue the injunction. *Id.* at 1228-29 (listing the four factors that the trial court should employ in determining whether to issue a permanent injunction).

### E. Motions For Judgment On The Administrative Record.

#### 1. The Contracting Officer's April 18, 2007 Reconsideration Of Competitive Range Determination.

##### a. Did Not Violate FAR 15.306, In Not Conducting Additional Offeror Discussions.

###### i. Plaintiff's Argument.

ISC argues that the "GSA violated FAR 15.306(c)(1) by establishing a [new] competitive range [determination] based on initial proposals and then failing to conduct meaningful [offeror] discussions[.]" Sec. Am. Compl. ¶ 34 at 9 (citing 48 C.F.R. § 15.306(c)(1)) ("Agencies shall evaluate all proposals in accordance with 15.305(a), and, if discussions are to be conducted, establish the competitive range."). ISC contends that the CO had two options: to evaluate the initial proposals, as received, and render an award without discussion; or to establish a competitive range and hold discussions. *See* Pl. Mem. II at 9 (citing AR 254). FAR requires meaningful negotiations "be held with each offeror in the competitive range–the only purpose for establishing a competitive range." *Id.* at 11 (citing 48 C.F.R. § 15.306(c)). Indeed, the CO's April 18, 2007 Reconsideration of Competitive Range Determination stated:

> Due to the number of minor price and technical issues associated with all of the proposals, technical and price discussions were anticipated for all offerors included in the competitive range. These discussions were expected to result in significant strengthening of technical proposals and further price clarity, which would lead to a final realistic, fair and reasonableness determination, and possibly provide for more favorable pricing for the Government. *However, the discussions could not be conducted until the competitive range was established in accordance with FAR 15.306(c). Once the competitive range was determined, discussions would commence with each offeror in the competitive range, to resolve any issues that had surfaced during the initial technical and price evaluation.*

AR 2547 (emphasis added).

ISC belittles the CO's excuse for not conducting additional discussions,[13] since the CO was instructed to follow all applicable regulations, including FAR 15.306(c)(1). *See* Pl. PH Br. at 4-5. Moreover, the CO's decision not to conduct additional discussions was irrational, because "[n]o rational person would believe that best value for the highly complex, information technology-based Fedbizopps system could be obtained on technical proposals that were 2 ½ years old." *Id.* at 8. In fact, that is why the FBO Contract subsequently was modified. *Id.* at 7-8 (citing AR Tab 160 at 2)

---

[13] *See* 11/29/07 TR at 91 (GOVERNMENT COUNSEL: "We . . . wanted to [hold discussions] because given what has happened so far, if we had done that and it wasn't in the Court's instructions, we would have wanted to tell—at least for the Court tell us you're allowed to do that.").

(Nov. 8, 2007 "PS02" Modification of Contract); *see also* 48 C.F.R. § 15.306(d)(2) ("The primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation.").

ISC claims prejudice, because the lack of discussions prevented ISC from responding to identified weaknesses and making proposal improvements. *See* Pl. Mem. II at 12. In fact, "[a] search of each of the discussion documents in the [Administrative Record] presents no evidence that [an] alleged ISC 'weakness' was ever discussed with ISC." Pl. PH Br. at 11 (citing AR 320-32, 368-83); *see also* AR 2581 (Oct. 15, 2007 Debriefing for ISC) ("Enhancements – CLIN 0001 must be augmented at a minimum with Evolution A. CLIN 0001 plus Evolution A option together satisfy the government's requirement, failure to include vendor customization found in MyFBO option reduces the attractiveness of the proposed system."). Moreover, "at least one alleged weakness and one alleged deficiency in ISC's proposal, out of 6 identified, was never identified during the earlier negotiations," and "GSA could have and should have raised these issues after a proper competitive range determination rather than denying ISC the opportunity to revise its proposal and present the best overall value solution to the government." *See* Pl. PH Br. at 12 (citing AR 2580-83). In ISC's opinion, the CO's failure to conduct additional offeror discussions was a significant error, in light of technology changes in the past two and a half years. *See* Pl. Mem. II at 12-13; *see also* Pl. Mem. II Att. 1 (Aug. 2, 2005 Office Of Management And Budget Memorandum For The Chief Information Officers) ("[W]e have set June 2008 as the date by which all agencies' infrastructure (network backbone) must be using IPv6 and agency networks must interface with this infrastructure."); OFFICE OF MGMT. & BUDGET, EXECUTIVE OFFICE OF THE PRESIDENT, OMB MEM. NO. M-05-22, MANDATE TO UPGRADE TO IPV.6 BY 6-08, 2005, *available at* www.whitehouse.gov/omb.memoranda/fy2005/m05-22.pdf.

**ii. The Government And Defendant-Intervenor's Responses.**

The Government responds that, in setting aside the prior FBO contract award, the court did not order GSA to hold another round of discussions. *See* Gov't Resp. II at 11 (quoting *Info. Scis. II*, 75 Fed. Cl. at 414) ("GSA must reconsider the competitive range determination. Once GSA establishes a competitive range that complies with the terms of the Solicitation and the FAR, a newly appointed SSA may utilize existing technical and price evaluations to determine which proposal represents the 'best value' to the agency."). GSA was to rely only upon existing price and technical ratings "once it reconsidered the competitive range." *Id.* at 12 (citing *Info. Scis. II*, 75 Fed. Cl. at 414). Moreover, "GSA already held discussions on original proposals with all offerors after the initial competitive range was set, thus satisfying even ISC's contorted interpretation of FAR 15.306." *Id.* at 13; *see also* Def. Int. PH Br. at 17 (citing AR 17-19). In fact, "repeated negotiations, requests for clarification, and other discussions [would result in] multiple revisions of initial proposals, rendering initial proposals meaningless[.]" Gov't Resp. II at 14. Therefore, the CO's decision "to follow the Court's instructions to the letter and not open new discussions was proper and within the CO's discretion." *Id.*; *see also* Def. Int. PH Br. at 17-18.

The Government also contends that ISC misconstrues FAR 15.306. *See* Gov't Resp. II at 11-14. The "text of FAR 15.306 . . . states only that the agency must establish the competitive range if discussions are to be held." *Id.* at 11 (citing 48 C.F.R. § 15.306(c)(1)). "As a matter of logic and

plain English, this does not mean that discussions must be held if a competitive range is established." *Id*. at 11-12. Moreover, FAR 15.306(a)(3) "confirms this by permitting [an] award without discussions if the solicitation states that the Government intends to evaluate proposals and make [an] award without discussions." *Id*. at 12.

In addition, the FBO Solicitation "advised all offerors that an award could be made without discussions:"

> The Government may conduct negotiations with offerors whose proposals are determined to be within the competitive range. However, offerors are cautioned to submit proposals on the most favorable basis, as to price, delivery, or time of completion and other factors, since *the government may elect to make an award without further discussions or negotiations*.

AR 254-55 (emphasis added).

**iii. The Court's Resolution.**

ISC interprets FAR 15.306(c)(1) to mean that discussions are required if a competitive range is set. *See* Sec. Am. Compl. ¶ 34 at 9. The text of FAR 15.306(c)(1), however, provides that setting a competitive range is required only if discussions are to be conducted, but not the reverse. *See* 48 C.F.R. § 15.306(c)(1) ("[a]gencies shall evaluate all proposals in accordance with 15.305(a), and, if discussions are to be conducted, establish the competitive range.").

In this case, the Solicitation provides that GSA may make an award without any discussions. *See* AR 144 (RFP § L.10); *see also* 48 C.F.R. § 15.306(a)(3) ("Award may be made *without discussions* if the solicitation states that the Government intends to evaluate proposals and make award without discussions.") (emphasis added). Although the CO's April 18, 2007 Competitive Range Determination may be read to imply that additional discussions would be held after the competitive range was reconsidered,[14] the court does not construe this statement as imposing any legal obligation on the CO to do so. The court has determined that the CO properly elected not to hold additional discussions, because neither the FAR, the Solicitation, nor the court required additional discussions. *See* AR 2561; *see also Impresa*, 238 F.3d at 1338-39 (when reviewing agency action the court must independently determine whether a decision has a rational basis based on the facts in the record); *DynCorp Intern LLC* v. *United States*, 76 Fed. Cl. 528, 539 (2007) ("It is well-established that when offerors are on notice that award may be made without discussions, the [G]overnment is not required, as a general rule, to hold discussions before award.").

---

[14] *See* AR 2547 ("[D]iscussions could not be conducted until the competitive range was established in accordance with FAR 15.306(c). Once the competitive range was determined, discussions would commence with each offeror in the competitive range, to resolve any issues that had surfaced during the initial technical and price evaluation.").

**b. Did Not Violate FAR 15.306, In Not Relying On The Price Evaluation Team's Analysis.**

**i. Plaintiff-Intervenor's Argument.**

DEVIS argues that the April 18, 2007 Reconsideration of Competitive Range Determination violated FAR 15.306(c), because it was not based on the Price Evaluation Team's analysis of Symplicity's Price Proposal. *See* Int. Mem. II at 12 (citing 48 C.F.R. § 15.306(c)(1)) ("*Based on the ratings of each proposal against all evaluation criteria*, the contracting officer shall establish a competitive range comprised of all of the most highly rated proposals, unless the range is further reduced for purposes of efficiency pursuant to paragraph (c)(2) of this section.") (emphasis added). FAR 15.306(c) requires that agencies "shall evaluate all proposals in accordance with [FAR] 15.305(a)," which in turn requires that "[a]n agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." 48 C.F.R. § 15.305(a).

The Price Evaluation Team, however, reported that it could not "determine realistic pricing from Symplicity for each CLIN on initial proposals [but] based on the pricing provided we attempted a *best guess*." Int. Mem. II at 15-16 (quoting AR 2387) (emphasis added). Therefore, DEVIS argues that in establishing the Reconsideration of Competitive Range Determination, the CO also simply "guessed" as to Symplicity's price. *Id.* at 15 (citing AR 2545-46); *see also* AR 2586 ("The original Competitive Range Determination was established using proposals submitted on 6/24/04. The reconsidered Competitive Range Determination was also established using the proposals submitted on 6/24/04."). Instead, the CO should have reconvened the Price Evaluation Team. *See* Int. Mem. II at 14. In electing not to do so, the CO "was required to apply the Price Evaluation Team's price *rating* against all criteria pursuant to FAR 15.306(c)." *Id.* at 15 (emphasis in original).

The CO's April 18, 2007 Reconsideration of Competitive Range Determination incorrectly reported that: "Symplicity's price proposal *clearly contained* accurate pricing, with *sufficient back-up* data, for eight years, including pricing for CLIN 0002 - FedTeds and CLIN 0003 - Electronic Proposal Receipt." *See* AR 2545 (emphasis added). DEVIS contends that this statement is flatly contradicted by the Administrative Record. *See* Int. Mem. II at 14 (citing AR Tab 158) (Symplicity 2004 FBO Price Proposal). Accordingly, the CO's calculation of Symplicity's price as $12 million[15] was not supported by the record. *Id.* at 12-13 ("In the initial competitive range determination, the [CO] simply did not consider price in making the competitive range determination. In this 'reconsidered' competitive range determination, the CO simply replaced the Price Evaluation Team's 'best guess' of Symplicity's pricing (*i.e.,* the Symplicity's price rating that FAR 15.306 requires him to evaluate) with his own 'guess' of Symplicity's pricing."); *see also* Int.

[15] DEVIS emphasized that "[t]he CO's only mention of the Symplicity [previous] price determination ($1,074,220) is to claim that it is a 'clerical error made by the contracting officer.'" Int. Mem. II at 14 (quoting AR 2545). Curiously, the nature of the "clerical error" was never explained. *Id.*

Mem. II Ex. 1 (Oct. 12, 2007 Debriefing for DEVIS) ("In establishing the new competitive range, GSA reconsidered the existing technical and price evaluations.").

**ii. The Government's Response.**

The Government responds that DEVIS "conflates and confuses" the prices that the CO was "directed to consider when setting the competitive range" with "the price analysis of final prices – the analysis that is required prior to award." Gov't Resp. II at 14. The court "required the CO to consider initial prices, *not* the later analysis of final prices by the Price Evaluation Team, in reconsidering his competitive range determination." *Id*. (emphasis added) (citing *Info. Scis. I*, 73 Fed. Cl. at 114; *Info. Scis. II*, 75 Fed. Cl. at 411-12). DEVIS also misconstrues FAR 15.306(c)(1) (requiring the CO to consider price), with FAR 15.308 and the Solicitation (requiring the SSA to consider the price evaluation in making a "best value" determination). *Compare* 48 C.F.R. § 15.306(c)(1) ("Based on the ratings of each proposal against all evaluation criteria, the contracting officer shall establish a competitive range comprised of all of the most highly rated proposals[.]") *with* 48 C.F.R. § 15.308 ("the SSA may use reports and analyses prepared by others").

In addition, the Government disputes DEVIS's assertion that the CO's redetermination was invalid. *See* Gov't Resp. II at 15 (citing Int. Mem. II at 13-14). Neither the FAR nor the Solicitation prohibits the CO "from independently calculating the price of Symplicity's initial proposal and then using that price to set the competitive range," and neither requires the CO to reconvene the Price Evaluation Team to "correct a calculation error that the CO himself identifies." *Id*. (citing Int. Mem. at 14). Because the CO properly applied Symplicity's June 2004 price proposal, the Government contends that the CO's actions were rational. *Id*. at 15-17.

**iii. The Court's Resolution.**

In *Information Sciences II*, the court instructed the CO to reconsider the August 16, 2004 Competitive Range Determination, in compliance with the Solicitation and all applicable FAR requirements. *See Info. Scis. II*, 75 Fed. Cl. at 414 ("GSA must reconsider the competitive range determination. Once GSA establishes a competitive range that complies with the terms of the Solicitation and the FAR, a newly appointed SSA may utilize existing technical and price evaluations to determine which proposal represents the 'best value' to the agency.").

In this case, the Solicitation states that price was one of four evaluation criteria. *See* AR 258 ("Price proposal(s) . . . will be evaluated[.]"); *see also* AR 264 ("To ensure fair, reasonable, balanced, and realistic prices, the Government will perform a price analysis."). Although the Solicitation requires the CO to consider price, when making the Competitive Range Determination, the Solicitation did not require the CO to rely on the price analyses of the Price Evaluation Team. *See* AR 154 (RFP § M.6.B) (as modified by Amendment 0006). The Solicitation only stated that the Price Evaluation Team's analysis would not employ ratings. *Id*. ("*The price proposal will not be rated and will be separate from the technical evaluation*.") (emphasis in original); *see also* AR 155 (RFP § M.8) ("Once the technical proposals have been evaluated and a consensus adjectival and confident [sic] rating are assigned, the rated technical proposals shall then be compared to the price

analysis and incentive plan and analysis for the proposal, to complete a best value determination for the Government.”).

FAR 15.306(c)(1) only requires the CO to consider price, if it is a Solicitation term. *See* 48 C.F.R. § 15.306(c)(1) (“Based on the ratings of each proposal against *all evaluation criteria*, the contracting officer shall establish a competitive range comprised of all of the most highly rated proposals[.]”) (emphasis added). FAR 15.308, however, permits the SSA to consider the final price *evaluation* in rendering a “best value” determination. *See* 48 C.F.R. § 15.308 (in making a “best value” determination “the SSA may use reports and analyses prepared by others”).

Since neither the FAR nor the Solicitation prohibited the CO from determining the price of Symplicity’s initial proposal and then using that price to establish the Reconsideration of Competitive Range, nor required the CO to reconvene the Price Evaluation Team to correct an error that the CO identified and reconciled, the CO’s price determination will not be set aside. *See Honeywell*, 870 F.2d at 648 (citation omitted) (holding when the trial court finds a “reasonable basis” for an agency’s action, the court should “stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.”); *see also John C. Grimberg*, 702 F.2d at 1372 (holding that the court may interfere with a federal procurement “only in extremely limited circumstances”).

**c. Did Not Violate FAR 15.306, In Correcting Defendant-Intervenor’s Price Proposal.**

**i. Plaintiff-Intervenor’s Argument.**

DEVIS claims that the CO violated FAR 15.306, because the Administrative Record does not support the CO’s determination that Symplicity’s price proposal was $12,044,563. *See* Pl. Int. PH Br. at 7-8; *see also* 11/29/07 TR at 38-40, 46. The Solicitation states “that ‘[*a*]*ll CLINs in Section B shall be priced* as a Firm-Fixed-Price, including optional CLIN’s 0002 and 0003.’” *Id*. at 11 (quoting AR 254) (RFP § L.8.3.4) (emphasis added); *see also* AR 247 (RFP § L.8.2) (“All CLINs in Section B shall be addressed[.]”); AR 263 (RFP § M.6) (“All CLIN’s in Section B shall be priced as a Firm-Fixed Price[.]”). In addition, RFP Provision L.8.3.4 requires that “all CLINs in Section B shall . . . contain sufficient price detail for equipment, labor, hosting, etc., to support the proposed Firm-Fixed Price and to permit the Government to determine that the proposed Firm-Fixed Price is fair and reasonable.” Pl. Int. PH Br. at 11 (quoting AR 254). Symplicity, however, “actually bid more than 2/3 of its pricing in *CLIN categories* [CLIN 1B1 and CLIN 4] *that simply did not exist in the RFP*.” *See id*. at 5 (emphasis in original); *see also* 11/29/07 TR at 137-39.

In addition, DEVIS argues that any discretion accorded the CO by “Section L” of the Solicitation did not permit the CO to disregard the mandatory price structure, because discretion is appropriate only “if the offeror complies with specific direction included in those sections[, and because] Symplicity failed to follow [this specific direction.].” Pl. Int. PH Br. at 14-15 (“In order for the flexibility in Section L.8.3.3 to apply, ‘[*t*]*he offeror must state* in their business proposal any exceptions taken to the terms and conditions of the solicitation.’ Further, ‘[t]he Offeror *shall identify and explain any exceptions or deviations* taken or conditional assumptions made with respect to the

requirements of this solicitation.' 'Also, the *benefit to the Government shall be explained* for each exception or deviation taken, or conditional assumptions made.'") (quoting AR 253) (RFP § L.8.3.3) (emphasis added). Since the Administrative Record evidences that none of these requirements were followed, discretion is irrelevant. *Id*. at 15-16.

Moreover, because Symplicity's price proposal "clearly inhibited easy access to whatever price information it did include," DEVIS contends that the CO violated FAR 15.306, by ignoring evaluation criteria, *i.e*., the added risk resulting from Symplicity's confusing price proposal. *See* Pl. Int. PH Br. at 16-17; *see also* AR 2538 (Aug. 16, 2004 Competitive Range Determination) ("Symplicity proposed a price extremely low compared to all other proposed prices, which makes it difficult to determine realistic pricing."); AR 245 (RFP § L.7) ("Excessive material inhibiting easy access to the technical and/or price information will be interpreted as an increased risk to the Government."); AR 246 (RFP § L.8.1) ("Offerors are cautioned that the quality of their proposal and adherence to solicitation response requirements and/or restrictions are considered reflective of the manner in which the Offeror could be expected to conduct FBO business and will be given due consideration throughout the evaluation process.").

DEVIS also asserts that the CO acted in bad faith by representing that a "clerical error" was the cause of his finding that Symplicity's proposed price was $1,074,022 in the prior August 16, 2004 Competitive Range Determination. *See* Pl. Int. PH Br. at 6. In fact, no evidence has ever been produced by the Government as to the precise nature of this "clerical error." *Id*. In contrast, DEVIS has presented evidence that this prior finding was not caused by a "clerical error," but by the CO "ignor[ing] the fundamental CLIN structure established by the RFP and [then] attempt[ing] to cover that up by characterizing his change as a 'clerical error.'" *Id*. (citing Int. Ex. A and AR Tab 163 (Dec. 10, 2007 Meyers Decl.)).

During the November 29, 2007 hearing, DEVIS introduced "Intervenor Exhibit A" to illustrate Symplicity's price proposal, with and without the allegedly improper "CLIN 1B1" and

"CLIN 4," to demonstrate that: the CO's explanation about the competitive range determination was demonstrably false; and the only Symplicity price supported by the record was [deleted]:

[deleted]

Int. Ex. A (Symplicity Price Calculation Table); *see also* 11/29/07 TR at 137 ("DEVIS'S COUNSEL: What you have is -- you have a ridiculously low number and if there was an error by the contracting officer, it was the difference between [deleted] and [deleted]."). DEVIS contends that Exhibit A demonstrates that the CO, in the prior Competitive Range Determination, decided to exclude pricing for CLINs that were not required by the RFP, but were "created from whole cloth." *See* Pl. Int. PH Br. at 8-9; *see also* Int. Ex. A, rows 16-17 (showing Symplicity price for "Year 1," when including only those CLINs referenced in the Solicitation, was $1,074,019.50); AR Tab 163 ¶¶ 20-21 (Dec. 10, 2007 Meyers Decl.) (same).

DEVIS states that it was prejudiced by these errors. *See* Int. Mem. II at 16-17. Since "[n]othing . . . has changed regarding the price rating for Symplicity's June 24, 2004 proposal[,] other than the fact that the CO has substituted his 'guess' for the Price Evaluation Team's 'best guess,' and there is no additional evidence in the record upon which the [Government's] determination could be different than the last time the court reviewed this procurement," the CO should have excluded Symplicity from the "reconsidered" Competitive Range Determination and included DEVIS. *Id.* (citing *Info. Scis. I*, 73 Fed. Cl. at 117).

**ii. The Government And Defendant-Intervenor's Responses.**

The Government responds that the CO properly reviewed the price proposals from all offerors and found that Symplicity's price proposal was $12,044,563 in reconsidering the Competitive Range Determination. *See* Gov't Resp. II at 10-11 (citing AR 2544-48). The CO explained "that the $1,074,220 price for Symplicity recorded in the original Competitive Range Determination was the result of a clerical error" and that the correct price was $12,044,563. *Id*. at 11 (citing AR 2545-46). The Government rejects DEVIS's argument that "the CO was required to use the mistaken $1,074,220 price for Symplicity's proposal . . . in the CO's original competitive range determination." Gov't Resp. II 15-16 (citing Int. Mem. II at 14). Moreover, the court never barred the CO from correcting a "clerical error" made in the prior Competitive Range Determination. *Id*. at 16 (citing AR 2545) ("The original Competitive Range Determination presented Symplicity's price as $1,074,220. This amount was a clerical error made by the Contracting Officer.").

The CO's re-calculation of Symplicity's price in the reconsidered Competitive Range Determination was not an "unexplained 'best guess,'" but the result of a methodical analysis of

Symplicity's initial proposal. *Id*.[16] "Because Symplicity's pricing was readily discernible from its proposed CLIN pricing, the CO had a rational basis – and perhaps even an obligation – to calculate the total proposal price as he did." Gov't PH Br. at 2 (citing AR Tab 158) (Symplicity 2004 FBO Price Proposal).[17] The CO calculated Symplicity's prices for Years 1 through 8 to total $12,044,563. *Id*. at 3. Significantly, this calculation was never disputed by ISC or DEVIS prior to the November 29, 2007 hearing, when DEVIS first insisted that "[deleted] of Symplicity's pricing should be summarily excluded from Symplicity's offer, resulting in a 'correct' total price of only [deleted]," after discounting the price for the allegedly improper "CLIN 1B1" and "CLIN 4." *Id*. (citing 11/29/07 TR at 136-40).

The Government explained that including the two "allegedly improper" CLINs was rational. First, CLIN 0004, described as "Ongoing Support Maintenance including Help Desk (7am-7pm), corresponded to labor costs for system engineers, help desk personnel, the program manager, and the operations manager." *Id*. (citing AR Tab 158 at 2, 7). Because the Solicitation "called for the creation of an electronic system, the provision of a help desk for technical support, and management of the entire operation, the CO reasonably and correctly understood that these labor positions were required for Symplicity to perform the contract." *Id*. at 12 (citing AR 198-200) ("Provide live technical and end user support between the hours of 7:00am to 7:00pm (Eastern Time)"). Second, CLIN 0001B1 corresponds to "Hosting Services Back-Up," which "refers to the management of servers that store the massive FBO database and connect users of the data." *Id*. at 12-13 (AR Tab 158 at 8). This CLIN also "referenced work that was called for in the solicitation and proposed by Symplicity in its initial offer." *Id*. at 13 (citing AR 200) ("Prevent data loss (e.g., a backup and recovery system, mirrored systems)"). In addition, the Government proffered a January 3, 2008 Declaration of the CO, attesting that: the Solicitation did not prohibit the use of additional CLINs; all of the CLINs priced by Symplicity corresponded to work to be performed under the contract; Symplicity's proposal – including all work proposed and priced – was evaluated by the technical evaluation team and rated "Acceptable" with "Confidence;" and it would have made no sense to exclude any of Symplicity's pricing from consideration in determining the competitive range. *Id*. (citing AR Tab 165) (Jan. 3, 2008 Abood Decl.).

---

[16] The CO calculated Symplicity's price as follows:

**Pricing Summary – Years 1 thru 8**

[deleted]

**TOTAL FOR ALL 8 YEARS $12,044,563**

*See* AR 2545-46.

[17] If the CO "recognized his error, left it uncorrected, and then eliminated Symplicity from the competitive range based on price – as DEVIS seems to urge was the only proper course to take – the CO's decision could be found to be arbitrary, capricious, and irrational." *See* Gov't Resp. II at 17 n.5.

The Government emphasized that the Solicitation did not prohibit Symplicity from itemizing pricing in additional CLINs. *See* Gov't PH Br. at 4-5. The Solicitation only "suggested" that the offerors "propose prices for the three-year Base Period and five one-year option periods using CLINS 0001A through 0001F and "asked offerors to price two options for the 'FedTeds' and 'EPR' modules." *Id.* (citing AR 196).

Symplicity provided a pricing summary for Year 1, by breaking the "lump sum CLIN" into "five sub-CLINs 0001A through E," and "providing pricing for the FedTeds and EPR options using the suggested format of CLINs 0002 and 0003," then "priced its proposed support maintenance labor under a separate CLIN 0004, and then priced 'hosting services back-up' under CLIN 0001B1." *Id.* at 5 (citing AR Tab 158 at 2, 8). This format was permissible, because "nothing in the solicitation made the suggested CLINs mandatory, and nothing in the solicitation warned offerors that a proposal would be deemed non-compliant if it did not break down its pricing in the suggested format."[18] *Id.* In addition, "[n]umerous sections of Section L of the Solicitation, which described the content of proposals, emphasized that proposals were not constrained by any particular format and that GSA maintained discretion in its review of proposals." *Id.* at 6 (citing AR 247) (RFP § L.8.2) (stating that all suggested CLINs were to be addressed, but not barring an offeror from proposing additional CLINs for convenience); *see also* AR 253-54 (RFP § L.8.3.3) (expressly allowing offerors to deviate from terms of the Solicitation so long as explained, and that deviations "will not, of themselves, automatically cause a proposal to be termed unacceptable.")). Accordingly, because Symplicity's proposal did not violate any mandatory Solicitation requirement, the CO's acceptance of Symplicity's price proposal was rational. Gov't PH Br. at 7-8; *see also Tidewater Mgmt. Svcs., Inc.* v. *United States*, 573 F.2d 65, 91 (Ct. Cl. 1978) ("The underlying complaint is that the award was unfair because [the awardee's] proposal was innovative in ways not foreseen by the RFP and not employed by the other bidders. The Government was free to accept a proposal incorporating innovative techniques with resulting economy and advantage to the United States."); *Data Gen.*, 78 F.3d at 1564 ("We know of no principle or precedent . . . that requires or even suggests disqualifying an otherwise qualified bidder because of inconsistencies in its quoted prices. The way to deal with that problem is to seek clarification of those prices, not to punish the bidder by disqualifying it. [The] disqualification suggestion is not a tenable basis for its claim of prejudice.").

Even if the court were to find that Symplicity's price proposal was "not compliant with mandatory technical requirements of the solicitation, [and thus] the proposal [was] unacceptable for award," the Government contends the dispositive issue is whether the inclusion of Symplicity into

---

[18] The Government characterizes the CLINs as "suggested" items, in contrast to "many requirements in the solicitation that were explicitly mandatory." *See* Gov't PH Br. at 5 n.4 (citing AR 195) (requiring a fully operational system by February 6, 2005 and a "seamless transition between the current contractor and the offeror"); *see also* AR 198-99 (listing mandatory performance features); AR 200-01 (describing system "constraints"); *ManTech Telecomms. and Info. Sys. Corp.* v. *United States*, 49 Fed. Cl. 57, 68 n.18 (2001) (observing that "the presence of such mandatory minimum language in one section of a solicitation and its omission in another must be presumed to have been purposeful and provides a strong indication that the latter provision is not a mandatory minimum requirement.") (citations omitted).

the *competitive range* was proper, not whether Symplicity should have received the final award. *Id.* at 8. In addition, DEVIS's argument that "non-responsive" bids must be rejected applies only to sealed bidding, and not negotiated procurements as here. Gov't PH Br. at 14-15 (citing *Griffy's Landscape Maint. LLC* v. *United States*, 46 Fed. Cl. 257, 259 (2000) ("One of the very purposes of negotiated procurement is to *allow offerors to correct deficiencies and errors*" in an initial proposal.) (emphasis added); *see also* 48 C.F.R. § 15.306(d) ("Negotiations . . . are undertaken with the intent of allowing the offeror to revise its proposal.").

Symplicity adds that the CO's price analysis in re-establishing the Competitive Range "was rational and consistent with the requirements of the FAR," emphasizing that the CO "has considerable discretion in making competitive range determinations." Def. Int. PH Br. at 11-12 (citing *Portfolio Disposition Mgmt. Group* v. *United States*, 64 Fed. Cl. 1, 10 (2005) ("A protestor carries a heavy burden in establishing that an agency improperly included an offeror in the competitive range for award of a contract."). Therefore, a protestor must prove that there is no rational basis for including a challenged offeror in the competitive range. *Id.* at 12 (citing *Portfolio*, 64 Fed. Cl. at 10). Neither ISC nor DEVIS has provided authority for the proposition that the "contracting officer violated FAR 15.306 (c) by *including* an offeror in the competitive range." *Id.* (emphasis in original).

The CO followed the court's instructions by reconsidering "the original competitive range determination based on an evaluation of the initial proposals," and then conducting "a specific analysis of price." *Id.* at 13 (citing AR 2540-48). The CO issued an April 18, 2007 "written summary of his reconsideration of the original competitive range determination based upon initial proposals" that rectified any deficiencies the court previously identified. *Id.* at 9-10 (citing AR 2540-48.). This summary included "an examination of Symplicity's initial price offer (*see* AR 2545-46) and affirmed "a clear indication of compatibility between its proposed prices and its proposed solution." *Id.* (citing AR 2544). Although the CO recognized "deficiencies" in the first price evaluation on reconsideration, he "expressly determined" that Symplicity's price was $12,044,563. *Id.* (citing AR 2545-46). In fact, Symplicity's initial proposal, regarding technical and price factors, "had as much a reasonable chance for selection for award as the proposals of either ISC or DEVIS, which both had perceived but correctable deficiencies and which both offered considerably higher prices than Symplicity[.]" *Id.* at 10.

DEVIS's argument that CLIN 0004 and CLIN 0001B1 should have disqualified Symplicity from the competitive range is also without merit, because "[b]oth of the services priced by Symplicity . . . are required to be provided by the FedBizOpps contractor and are expressly contemplated in the Solicitation." *Id.* at 13 (citing AR 92). Symplicity concedes that the CO recognized that Symplicity's price proposal was "not entirely in the requested format," since it included CLINs that were not provided for in the Solicitation. *Id.* (quoting AR 2545).[19] Symplicity explains, however, that it decided to "break out certain services and price them under additional,

[19] These included "CLIN 0004 for 'Ongoing Support Maintenance including Help Desk (7 am – 7 pm)' for years 1 – 8 and a CLIN 0001B1 for 'Hosting Services Back-up' for years 2 – 8." *Id.* (citing AR Tab 158, at 2) (Symplicity's 2004 Price Proposal).

separate CLINs," without changing the overall price. *Id*. at 14 ("The services were offered as required, and Symplicity's pricing was the same whether it left the services under the prescribed CLINs or entered them separately under the new CLINs."). Subsequently, GSA advised Symplicity to "revise its pricing to comport strictly with the pricing format in the Solicitation," and Symplicity did just that. *Id.* (citing AR 242, 126C). In any event, Symplicity's "formatting . . . deficiency, was harmless and had no impact on its qualification for inclusion in the competitive range." *Id*.; *see also* *Mantech Telecomms*., 49 Fed. Cl. at 72 (offeror's failure to comply with a Solicitation did not require its exclusion, but "provided a basis for further discussions and other steps designed to cure the identified defects."); AR 2545 (Sept. 13, 2007 Competitive Range Determination) ("The clarification issues associated with Symplicity's price proposal were minor in nature and could easily be resolved in discussions."). As the CO reported, "all of the proposals had a 'number of minor price and technical issues.'" Def. Int. PH Br. at 15 (citing AR 2547).

Finally, Symplicity rejects DEVIS's argument that "the $12 million figure[,] determined by the CO as the price offered in Symplicity's initial proposal for purposes of reconsidering the competitive range[,] is a 'complete fabrication.'" *Id*. at 15 (citing 11/29/07 TR at 43-44) (DEVIS'S COUNSEL: Symplicity's price proposal "might as well come from a telephone book."); *see also* 11/29/07 TR at 42-43 (DEVIS'S COUNSEL: "You will not find those numbers supported in the record or explained by either the contracting officer or counsel."). Symplicity explains that the CO summarized Symplicity's price proposal by year, which together totals $12,044,563. *See* AR 2547-46. The price for all CLINs listed for Year One, in Symplicity's initial price proposal, [deleted], is "essentially equal to the CO's figure for year one." Def. Int. PH Br. at 15-16 (AR 158). These figures are identical to those DEVIS found when "adding up each CLIN in Symplicity's initial proposal by year." *Id.* at 16 (citing AR Tab 163 ¶¶ 4-17 (Dec. 10, 2007 Meyers Decl.)). Symplicity concludes that it was "within [the Government's] discretion to accept and use the pricing in Symplicity's initial offer for calculation purposes, notwithstanding the formatting error or deficiency, because the total price offered in the initial proposal was nonetheless unambiguous." *Id*. at 16.

**iii. The Court's Resolution.**

The court rejects DEVIS's contention that the April 18, 2007 Reconsideration of the Competitive Range is "is flatly contradicted by the Administrative Record," "invalid," and that Symplicity's proposal "clearly inhibited easy access to whatever price information it did include," in violation of Sections L.7 and L.8.1 of the Solicitation and FAR 15.306. *See* Pl. Int. PH Br. at 16-17; *see also* Int. Mem. II at 14. The court is satisfied that Symplicity's total offered price could be discerned by comparing the price proposal to the Solicitation's requested CLIN pricing format. *See* AR 2545 (April 18, 2007 Competitive Range Determination) ("Symplicity's price proposal clearly contained accurate pricing, with sufficient back-up data for eight years, including pricing for CLIN 0002 - FedTeds and CLIN 0003 - Electronic Proposal Receipt."). Accordingly, it was rational for the CO to determine that Symplicity's total price was $12,044,563. *See* AR 2545; *see also* AR Tab 158 (Symplicity's price proposal identifying and explaining each CLIN including "CLIN 0004" and "CLIN 0001B1"); Int. Ex. A (DEVIS exhibit showing that Symplicity's total price was around $12 million).

The court also rejects DEVIS's argument that the CO engaged in "fraud," because Symplicity's price was not the result of a "clerical error," but the CO calculating Symplicity's "Year 1" CLINs so they would comply with the Solicitation. *See* Int. Ex. A (Symplicity Price Calculation Table); *see also* 11/29/07 TR at 135 (DEVIS'S COUNSEL: "[T]he omissions of contract line item 0004 and 0001B1 were in fact identified by the contracting officer[.]"). Without evidence of actual misconduct, the court must assume that the CO misread Symplicity's proposal and the CO's corrective actions were made in good faith. *See T&M Distribs., Inc.* v. *United States*, 185 F.3d 1279, 1285 (Fed. Cir. 1999) ("[G]overnment officials are presumed to act in good faith, and it requires 'well-nigh irrefragable proof' to induce the court to abandon the presumption of good faith[.]") (quoting *Kalvar Corp*. v. *United States*, 543 F.2d 1298, 1301-02 (Ct. Cl. 1976)).

Symplicity's price proposal also did not violate the terms of the Solicitation stating that all "CLINs in Section B shall be addressed," and "be priced as a Firm-Fixed Price[.]" AR 247 (RFP § L.8.2), 263 (RFP § M.6). Section L.8.3.4 of the Solicitation requires that an offeror's price proposal contain "sufficient price detail for equipment, labor, hosting, etc., to support the proposed Firm-Fixed Price and to permit the Government to determine that the proposed Firm-Fixed Price is fair and reasonable." AR 254. The Solicitation also requires offerors to propose prices for the three-year Base Period and five one-year option periods using CLINs 0001A through 0001F, and propose two options for the 'FedTeds' (CLIN 0002) and 'EPR' modules (CLIN 0003). *See* AR 196 (RFP § B.2). In response, Symplicity provided a price summary for Year 1, but broke out the "lump sum CLIN" into "five sub-CLINs 0001A through E," pricing the FedTeds and EPR options by using the requested format of CLINs 0002 and 0003, proposing support maintenance labor under a separate CLIN 0004, and "hosting services back-up" under CLIN 0001B1. *See* AR Tab 158 at 2, 8. CLIN 0004 for Ongoing Support Maintenance, including Help Desk (7 am – 7 pm) for years 1 through 8, and CLIN 0001B1 for Hosting Services Back-up for years 2 through 8, were expressly contemplated in the Solicitation, and properly were included by the CO in finding Symplicity's total price was $12,044,563. *See* AR 92. In effect, Symplicity simply broke down "certain [requested] services and price[d] them under additional, separate CLINs," without changing the overall price. *See* Def. Int. PH Br. at 14.

The court recognizes that Sub-CLIN 0001F, requested in Section B of the Solicitation, was not included in Symplicity's price proposal. *See* AR 247 ("All CLINs in Section B shall be addressed, including optional CLIN's 0002 and 0003."); *see also* AR 196 ("CLIN 0001F Option Period 5 (1 year)"); AR Tab 158 (Symplicity price proposal missing sub-CLIN 0001F, without explanation). It is unclear, however, if inclusion of each "*sub*-CLIN" was required by the Solicitation, even if each CLIN was required. *See* AR 247 ("All CLINs in Section B shall be addressed, including optional CLIN's 0002 and 0003."). In any event, ISC's and DEVIS's initial price proposals also had a "number of minor price and technical issues." *See* AR 2545-47 (April 18, 2007 Competitive Range Determination) ("The clarification issues associated with [ISC's, DEVIS's, and Symplicity's] price proposal[s] were minor[.]"). For this reason, Section L.8.3.3 of the Solicitation provides that "[s]uch exceptions, deviations, or conditional assumptions will not, of themselves, *automatically cause a proposal to be termed unacceptable*." AR 253 (RFP § L.8.3.3) (emphasis added).

Accordingly, the court has determined that the CO did not violate FAR 15.306, nor act contrary to the Solicitation, by including Symplicity's price proposal in the April 18, 2007 Reconsideration of the Competitive Range Determination, although there were "some" deviations from the requested pricing structure. *See Data Gen.*, 78 F.3d at 1564 (holding that a CO should not be required to "disqualify[] an otherwise qualified bidder because of inconsistencies in its quoted prices," where there is no substantial deviation from the RFP.).

**d. Did Not Violate FAR 15.306, In Not Conducting A "Price Realism Analysis."**

**i. Plaintiff's Argument.**

ISC alleges that GSA did not conduct a price realism analysis to inquire into Symplicity's two-and-a-half-year-old "low-ball" price. *See* Sec. Am. Compl. ¶¶ 26, 31, 32, at 8-9. As the February 11, 2005 Price Evaluation revealed: "[The Price Evaluation Team was] not able to determine realistic pricing from Symplicity for each CLIN on initial proposals[;] however[,] based on the pricing provided we attempted a best guess." AR 2387. Accordingly, including Symplicity's price proposal in the April 18, 2007 Reconsideration of Competitive Range Determination was in error. *See* Sec. Am. Compl. ¶ 31, at 9; *see also* Pl. Mem. II at 12.

**ii. Defendant-Interventor's Response.**

Symplicity contends that the GSA's price "realism" decision should be respected "absent some demonstrable violation of the FAR or palpable irrationality." Def. Int. PH Br. at 24 (citing 48 C.F.R. § 15.404-1(a)) (a price realism analysis "ensure[s] that the final agreed-to price is fair and reasonable"); *see also* 48 C.F.R. § 15.404-1(b) (price analysis "is the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit."); 48 C.F.R. § 15.404-1(b)(2) (a variety of price analysis techniques and procedures may be used to ensure a fair and reasonable price); 48 C.F.R. § 15.404-1(b)(2)(i) (the agency may "compare proposed prices received in response to the solicitation" and adequate price competition typically establishes price reasonableness); 48 C.F.R. §§ 15.404-1(b)(2)(ii), (c)(2)(iii) (the agency may compare "previously proposed prices and previous government and commercial contract prices with current proposed prices for the same or similar items" and may compare proposed prices with independent government cost estimates). The Government did not respond to this ISC argument.

**iii. The Court's Resolution.**

In this case, the Solicitation advised potential offerors that the "[p]rice evaluation will focus *heavily* on the *realism of the proposed prices* for the scope and nature of the solution/services proposed." AR 257 (emphasis added); *see also Int'l Outsourcing Servs., LLC* v. *United States*, 69 Fed. Cl. 40, 47 n.7 (2005) ("However, an agency at its discretion may . . . provide for a price realism analysis *in the solicitation* of fixed-price proposals.") (internal citations omitted) (emphasis added); 48 C.F.R. §§ 15.404-1(a)(1), (d)(3) ("The contracting officer is responsible for evaluating the reasonableness of the offered prices . . . [P]roposals shall be evaluated *using the criteria in the solicitation*[.]") (emphasis added). The Solicitation also provided that: "A *price analysis* of each

CLIN, including optional CLIN 0002 and optional CLIN 0003, *will be performed* on the proposed Firm-Fixed Price, including an analysis of the price detail for equipment, labor, hosting, etc., which supports the proposed Firm-Fixed Price. The price analysis *will be performed* in accordance with FAR 15.404-1(b)(2)(ii) through (vii) to allow the Government to determine that the proposed Firm-Fixed Price is *fair and reasonable*." AR 264 (emphasis added).

The Solicitation provided for a "price analysis" *and* a "price realism analysis," but nothing more. *Id*. ("The price analysis will be performed in accordance with FAR 15.404-1(b)(2)(ii) through (vii)"); *see also* AR 257 ("Price evaluation will *focus heavily on the realism of the proposed prices* for the scope and nature of the solution/services proposed.") (emphasis added). The court previously determined that GSA conducted an adequate price analysis and price realism analysis of Symplicity's proposal. *See Info. Scis. I*, 73 Fed. Cl. at 102-03 ("By providing a cogent explanation as to why Symplicity's price was lower than the other offerors, the court is satisfied that GSA Price Team performed a 'price realism analysis' in accordance with the Solicitation."); *see also* AR 2404 (Feb. 11, 2005 FBO Price Analysis approved by CO). ISC's re-argument to the contrary is not persuasive. *See Info. Scis. II*, 75 Fed. Cl. at 413-14 ("GSA must reconsider the competitive range determination. Once GSA establishes a competitive range that complies with the terms of the Solicitation and the FAR, a newly appointed SSA may utilize *existing technical and price evaluations* to determine which proposal represents the 'best value' to the agency.") (emphasis added). The record evidences that the CO did not violate FAR, act contrary to the Solicitation, nor fail to comply with the court's order. *See* AR 2559-61.

### 2. The New Source Selection Authority's September 13, 2007 Source Selection Decision.

#### a. "Best Value" Analysis Did Not Comply With FAR 15.101 And FAR 15.308.

##### i. Plaintiff And Plaintiff-Intervenor's Arguments.

ISC argues "there is no explanation in the [September 13, 2007 revised] Source Selection Decision as to why the new SSA concluded that ISC's [technical] proposal obtained a risk rating of 'Confidence' when . . . GSA described one of ISC's strengths as having 'high probability of transition success' which . . . reasonably equates to a rating of 'High Confidence.'" Pl. Mem. II at 18 (citing AR 2580).[20] In contrast, "[t]he majority technical evaluation team ranked Symplicity's

---

[20] The Solicitation provides that: "[b]oth an adjectival rating and confidence [risk] rating will be assigned to each [Evaluation Factor]. The adjectival rating and confidence rating are of equal importance." *See* AR 261 (RFP § M.5). The new SSA relied on the Majority, Minority, and Mitretek Reports, which each accorded an overall adjectival and confidence/risk rating for each offeror. After reviewing these reports, the new SSA assigned a single adjectival and confidence/risk rating to each offeror, based on the ratings in the aforementioned reports, in issuing the September 13, 2007 revised Source Selection Decision. *See* AR 2561 (Sept. 13, 2007 Source Selection Decision).

proposal as a high risk and gave it a 'Little Confidence' rating." Pl. Mem. II at 16-17 (citing AR 2563). Nevertheless, the new SSA concluded: "It is my judgment that the Minority and Mitretek assessments [are] more accurate, and should be given more weight than the Majority evaluation. Therefore, it is my judgment that the Symplicity proposal is 'Acceptable' with 'Confidence.'" *Id.* at 17 (citing AR 2561). ISC asserts that "[t]here is not a single word of explanation as to how the new SSA evaluated or examined or decided that Symplicity deserved a 'Confidence' [risk] rating . . . other than to state that 'the Minority and Mitretek comments on the level of staffing proposed by Symplicity leads me to conclude that Symplicity has in fact proposed sufficient staffing and hours to meet the objectives in the RFP." *Id.* (quoting AR 2561); *but see* AR 813 (April 5, 2005 Majority Report: Symplicity) ("The amount of resources to adequately manage and provide transition, maintenance, and support has been grossly underestimated by Symplicity and presents a significant risk of unsuccessful contract performance."); AR 964 (April 6, 2005 Minority Report: Symplicity) ("Based on the information provided and the interpretations and conclusions drawn, the minority opinion-holders believe the aggregate hours available are the absolute minimum to support Symplicity's planned approach. It is possible that they have understated their proposed hours."). Therefore, ISC argues that: "[t]he new SSA [did] not provide any indication as to what factors he actually considered to conclude that Symplicity's under-staffed proposal on a fixed-price 8-year contract deserved a [risk] rating of 'Confidence' and a rating that was equal to that given [to] the incumbent, ISC[,] which has been successfully operating Fedbizopps for 9 years." Pl. Mem. II at 17-18.

The new SSA's adjectival rating of ISC's technical proposal as "Acceptable" is also challenged, because ISC's "proposal clearly exceeded the minimum requirements of the Solicitation[.]" *See* Sec. Am. Compl. ¶¶ 27-28, at 8. ISC contends that it had a number of enhancements that exceeded minimum requirements, and thus should have been assigned an "Excellent" rating. *Id.* ¶ 28, at 8.

DEVIS agrees that the new SSA misread or ignored the underlying technical proposals and ratings. Although "[t]he [new] SSA claims that he 'reviewed *all* materials, including the Acquisition Plan, Source Selection Evaluation Plan, Solicitation, Proposals, Majority, Minority, and Independent evaluation reports, Competitive Range Determination, Price Evaluation, the Reconsideration of the Competitive Range Determination, and the [court's] decision[,]'" he "never claims to have been provided with or even to have laid eyes on DEVIS's proposal." *See* Int. Mem. II at 29-30 (quoting AR 2559) (Sept. 13, 2007 Source Selection Decision)). DEVIS reminds the court that "the Mitretek [R]eport found a vast number of advantages and only a few weaknesses or disadvantages, as follows: 'Advantages' 63; 'Neutral' 1; 'Weaknesses' 4; 'Disadvantages' 2; 'Potential Disadvantages' 1; Total Mitretek Findings 71." *See id.* at 31 (citing AR 671-83) (Feb. 13, 2005 Mitretek Report: DEVIS). DEVIS also relies on the fact that Mitretek "expressly noted" that "the weaknesses cited are minor," compared to the "[n]umerous advantages" of DEVIS's proposal. *Id.* (citing AR 668). Therefore, DEVIS contends that "[o]nly an SSA who did not review the record carefully and was unaware of the importance of ensuring that the agency obtained a premier FBO system could have concluded that Mitretek reported 'a number of weaknesses and disadvantages associated with the DEVIS

proposal.'" *Id.* (quoting AR 2560) (Sept. 13, 2007 Source Selection Decision). DEVIS characterizes the SSA's characterization as "a blatant misreading of the record."[21] *Id.* at 30-31.

DEVIS continues that "[t]he [new] SSA [also] failed to recognize the fact that [DEVIS's technical] proposal was not merely 'Excellent,' it was uniquely distinguished from the other proposals in a variety of ways: Only DEVIS's proposal was rated 'Excellent' overall; the 'Minority' and Mitretek reports agreed DEVIS's proposal was 'Excellent;' [DEVIS's] proposal was rated 'Excellent' in four of five evaluation categories; neither the Technical Evaluation Team Report nor the 'Minority' or Mitretek Reports rated any other proposal "Excellent" in any evaluation category; and "[a]ll members of the Technical Evaluation Team rated DEVIS's overall offering excellent.'" *See* Int. Mem. II at 28 (citing AR 2563 (Sept. 13, 2007 Source Selection Decision)); AR 850 (April 20, 2005 Minority Report: DEVIS)).

In addition, DEVIS argues that the new SSA's "best value" analysis failed to comply with FAR 15.308, because it did not "recognize, consider, or apply the substantive source selection criteria as set forth in the [S]olicitation." *See* Int. Mem. II at 17, 22-24. First, the new SSA disregarded the purpose set forth in the Solicitation, *i.e.*, to obtain a "premier federal acquisition system that its users highly value as their primary tool in managing federal procurement opportunities."[22] *Id.* at 23 (citing AR 89) (RFP § C.1 ("Purpose")) ("The Offeror is encouraged to propose creative, innovative solutions that deliver the required functionality without the constraints of the current system and exceed cited requirements and capabilities so that the government may obtain the best value."). Accordingly, the FBO procurement was "designed to ensure that the awardee will 'exceed . . . minimum requirements and capabilities' as set forth in the RFP." *Id.*

---

[21] The new SSA acknowledged that:

> [a]mong DEVIS's strengths are technical software and hardware architecture, data archival strategy, features and functionality, understanding of the issues, and transition plan. The Majority, Minority, and Mitretek evaluations judged the DEVIS proposal to be technically superior to the other three proposals in the competitive range. In fact, the DEVIS proposal was uniformly rated "Excellent" with "Significant Confidence." *However, both the Minority and Mitretek evaluations noted a number of weaknesses and disadvantages associated with the DEVIS proposal.*

Int. Mem. II at 30 (quoting AR 2560) (emphasis added).

[22] *See* FedBizOpps.gov website, http://www.fedbizopps.gov/ ("FedBizOpps.gov is the single government point-of-entry (GPE) for Federal government procurement opportunities over $25,000. Government buyers are able to publicize their business opportunities by posting information directly to FedBizOpps via the Internet. Through one portal - FedBizOpps (FBO) - commercial vendors seeking Federal markets for their products and services can search, monitor and retrieve opportunities solicited by the entire Federal contracting community.").

In addition, the new SSA did not apply the "critical substantive evaluation factors set forth in the RFP," including placing more reliance on the technical factors over the price and incentive plans. *Id*. at 26-27 (citing AR 148) (RFP § M.2 ("Evaluation Criteria")) ("Relative Importance of Evaluation Areas: A. *All technical evaluation factors, when combined, are significantly more important than price and incentive plan*. However, if technical evaluations are close, the price analysis and incentive plan analysis will take on more importance.") (emphasis added). In addition, the new SSA failed to follow instructions in the Solicitation that "only 'if technical evaluations are close, the price analysis . . . will take on more importance.'" *Id*. at 27.

These errors prejudiced DEVIS, because it "would likely have been found to be the best value to the government based on an analysis of the factors listed in the solicitation." *Id*. at 37; *see also Info. Scis. I*, 73 Fed. Cl. at 121 ("[P]rejudice in the context of a violation of FAR 15.308 requires that the protestor's chances of receiving the contract be increased, if the SSA complied with the FAR.").

**ii. The Government And Defendant-Intervenor's Response.**

The Government responds that the dispositive issue is "whether the [new] SSA properly relied upon the [evaluators'] ratings in selecting Symplicity for the award." Gov't Resp. II at 18 (citing AR 813, 927). The Administrative Record evidences that the new SSA "reviewed and understood the [prior] evaluations of Symplicity's proposal," "itemized the major weaknesses in the Symplicity proposal," including the perceived minimal staffing concerns, and then "balanced these weaknesses against the strengths of this proposal." *Id*. at 27 (citing AR 2560-61) (Sept. 13, 2007 Source Selection Decision). Therefore, the new SSA did not "ignore" any weaknesses. *Id*.

Moreover, the new SSA's Source Selection Decision acknowledged DEVIS's excellent ratings, strengths and weaknesses. *See* Gov't Resp. II at 26 (citing AR 2560-61) (Sept. 13, 2007 Source Selection Decision). Therefore, the Government rejects DEVIS's contention that the new SSA "never . . . was provided with or even laid eyes on DEVIS's proposal." *Id*. at 27 (quoting Int. Mem. II. at 30). The new SSA "reviewed *all materials*, including the Acquisition Plan, Source Selection Evaluation Plan, Solicitation, Proposals, majority, minority, and independent evaluation reports[.]" *Id*. (citing AR 2559) (emphasis added).

The Government then turns to DEVIS's argument that the SSA disregarded the importance of technical rating over price in making the "best value" tradeoff. Gov't Resp. at 26 (citing Int. Mem. II at 26-27) ("DEVIS also complains that because its proposal was rated 'Excellent' while Symplicity's was rated only 'Acceptable,' the SSA was not permitted to consider price in making the award."). The RFP states that technical evaluation factors are "significantly more important than price" unless the technical evaluations are close; therefore the new SSA was not "required to select DEVIS's proposal because it received the highest technical ratings." *Id*. (citing AR 265) (RFP § M.8) ("[T]he best value tradeoff process . . . permits tradeoffs among price and non-price factors and allows the Government to accept other than the lowest priced proposal or the highest technically rated proposal."). Because the new SSA was permitted to select an "Acceptable" proposal over an "Excellent" proposal, in light of DEVIS's "enormous price premium," the new "SSA's judgment

was reasonable given that DEVIS's 'Excellent' proposal ([deleted]) was more than [deleted] the price of Symplicity's 'Acceptable' proposal ([deleted])." *Id*.; *see also* Def. Int. PH Br. at 20-21.

The Government concludes that the new SSA properly conducted a "best value" tradeoff analysis and selected Symplicity "as representing the best value to the Government because of its 'innovative approach, many enhancements over the existing system, and a program that will lower the costs of operation,' as well as its price." Gov't Resp. II at 23 (quoting AR 2562) (Sept. 13, 2007 Source Selection Decision).

Symplicity adds that it is unwarranted to assume that Symplicity's proposal was technically inadequate simply because of the low price offered. *See* Def. Int. PH Br. at 23 ("There seems to be an unstated presumption on the part of DEVIS and ISC that Symplicity is simply unqualified to perform this contract for that reason. Such allegations are particularly unwarranted in light of Symplicity's qualifications."). Symplicity claims that it more than qualified to perform this contract, as "a leading provider of information technology solutions in the education and government sectors . . . [serving] many universities, and government agencies[.]" *Id*.

**iii. The Court's Resolution.**

FAR 15.308 provides, in relevant part, that the Source Selection Decision "be based on a comparative assessment of proposals against all source selection criteria in the solicitation." 48 C.F.R. § 15.308. In addition, FAR 15.101, the regulation governing "best value" procurements, provides:

> An agency can obtain best value in negotiated acquisitions by using any one or a combination of source selection approaches. In different types of acquisitions, the *relative importance of cost or price may vary*. For example, in acquisitions where the requirement is clearly definable and the risk of unsuccessful contract performance is minimal, cost or price may play a dominant role in source selection. The less definitive the requirement, the more development work required, or the *greater the performance risk, the more technical or past performance considerations* may play a dominant role in source selection.

48 C.F.R. § 15.101 (emphasis added).

The United States Court of Appeals for the Federal Circuit has held that a "best value" determination "grounded in reason" generally must be afforded considerable discretion. *See Grumman Data Sys. Corp*. v. *Navy*, 88 F.3d 990, 995-96 (Fed. Cir. 1996); *see also Galen Med. Assocs*., 369 F.3d at 1330 ("[A]s the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion . . . the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted). "Best value" decisions, however, must be conducted according to the criteria established in the Solicitation and FAR. *See Banknote Corp.*, 365 F.3d at 1355 ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when . . . the contract is to . . . provide

the agency with the best value. The issue here is whether the contracting officer acted within the *scope of that discretion*.") (emphasis added) (citations omitted).

In the prior protest, ISC and DEVIS challenged the *procedure* by which the SSA conducted the "comparative assessment."[23] In this protest, ISC and DEVIS challenge the new SSA's failure to adhere to the Solicitation's Source Selection Criteria in issuing the September 13, 2007 revised Source Selection Decision and re-awarding the FBO contract to Symplicity. *See, e.g.*, Int. Mem. II at 27 ("In this case, the SSA did violate FAR 15.308 because there is no evidence in the record that the SSA adhered to the either of the two critical evaluation rules[.]").

The Solicitation lists four "Evaluation Factors:"

> A. Technical Proposal, Volume 1, Evaluation Factors
> 1. Technical Approach
> 2. Management Approach
> 3. Past Performance
> 4. Key Personnel Staffing and Experience
>
> B. Oral Presentation and Operational Capability Demonstration (OCD) (will be performed after the competitive range is set and is an extension of the Technical Proposal)
>
> C. Price Analysis (Separate from Technical and Incentive Plan Analysis)
>
> D. Incentive Plan Analysis (Separate from Technical and Price Analysis)
>
> The technical proposal, which includes the oral presentation and operational capabilities demonstration (OCD) will be evaluated and rated.

AR 257-58 (RFP § M.2).

The Solicitation also describes the "relative importance" of each of the aforementioned "Evaluation Factors," and emphasizes that all "technical evaluation proposals, when combined, are *significantly* more important than price and incentive plan [factors]." AR 258-65 (RFP § M.2) (emphasis added). In addition, the Solicitation states that "if technical evaluations are close, [then] the price analysis and incentive plan analysis will take on more importance." AR 258. Of the five

---

[23] *See* Plaintiff's Post Hearing Brief, *Info. Scis. Corp.* v. *United States*, No. 05-1342 (April 25, 2006), at 9 ("In the 'Best Value Determination' . . . . no attempt [was made] to perform a comparative analysis among the identified strengths of the proposal."); *see also* Intervenor's Post Hearing Brief, *Info. Scis. Corp.* v. *United States*, No. 05-1342 (April 24, 2006), at 6 ("In this case there is nothing in the Administrative Record that shows *any comparative* analysis[.]") (emphasis in original).

Subfactors for the Technical Proposal Factor, Technical Approach was the most important, followed by Management Approach, Past Performance, Key Personnel Staffing and Experience. *Id.*

The Administrative Record evidences a significant contrast between the technical evaluations of DEVIS, Symplicity, and ISC. The new SSA recognized that DEVIS "was the only technical proposal where there was a consensus of excellent or acceptable on all evaluation factors," including strength in "technical software and hardware architecture, data archival strategy, features and functionality, understanding of the issues, and transition plan." AR 2560 (Sept. 13, 2007 Source Selection Decision). In fact, DEVIS's proposal was "uniformly rated 'Excellent' with 'Significant Confidence.'" *Id.* Although the Minority Report identified some "weaknesses" in DEVIS's proposal, almost all were expressly characterized as being "minor." *See* AR 856-74.

In contrast, the Majority Report rated Symplicity's technical proposal as "Unacceptable," with a "Little Confidence" risk rating, concluding that:

> The amount of resources to adequately manage and provide transition, maintenance, and support has been *grossly underestimated* by Symplicity and presents a *significant risk* of unsuccessful contract performance. Symplicity's technical approach is acceptable, but the government is acquiring a contractor for comprehensive development, implementation, transition, operations and support for a *new* FBO system, and the *Symplicity proposal is too vague in key areas and too lightly staffed in areas that are crucial to the introduction of new techniques and interfaces*. *The performance risk is rated as unacceptable.*

AR 813 (April 5, 2005 Majority Technical Report: Symplicity) (emphasis added).

On the other hand, while the Minority and Mitretek Reports concluded that Symplicity's proposal was "Acceptable," both expressed concern that:

> Symplicity proposes FBO with very little staff support and has probably proposed the minimum feasible staffing . . . . [A] question remains whether Symplicity has enough staff resource allocated to its transition and ongoing program support efforts. Outreach and training look to be severely understaffed during initial transition . . . . Most implementation activities have *relatively little staff resource* allocated indicating that Symplicity does not expect significant efforts in any of those tasks. Ongoing operations staffing also appears *minimal* . . . . *Based on the information provided and the interpretations and conclusions drawn, the minority opinion-holders believe the aggregate hours available are the absolute minimum to support Symplicity's planned approach. It is possible that they have understated their proposed hours* . . . . The minority opinion holders agree with the majority opinion which states, "Outreach and training during the initial transition are well described but staff sources *explicitly assigned* to activities associated with outreach and training

> *appear inadequate for the level of activity proposed*" . . . . As stated elsewhere, there is concern about Simplicity not having identified any labor hours specifically assigned to outreach and training in years 2 through 8.

AR 719, 964, 971-72, 975, 986 (emphasis in original).

The Majority Report rated ISC's technical proposal as "Marginal" with "Little Confidence," the Minority Report rated ISC as "Acceptable" with "Confidence," and the Mitretek Report rated ISC as "Acceptable." *See* AR 2560, 2563. Therefore, ISC's proposal was rated higher overall than Symplicity's. The new SSA, however, erroneously concluded that "*ISC and Symplicity both received similar technical adjectival ratings*." AR 2561 (emphasis added). First, the new SSA was not authorized to change the ratings of the Technical Team. The new SSA's job was to *compare* the *existing technical ratings of the technical professionals* with the price analysis and incentive plan analysis and conduct a "best value" analysis. *See* AR 265 (RFP § M.8) ("Once the technical proposals have been evaluated and a consensus adjectival and confidence ratings are assigned, the *rated technical proposals shall then be compared to the price analysis and incentive plan analysis* for each proposal, to complete a best value determination for the Government."). In making his own independent assessment of the technical ratings, the new SSA reached a conclusion that is not supported by the record:

The following chart sets forth the relevant final "adjectival ratings:"

Majority Report

| Offeror | Adjectival Rating | Confidence Rating |
|---|---|---|
| DEVIS | Excellent | Significant Confidence |
| ISC | *Marginal* | Little Confidence |
| Symplicity | *Unacceptable* | Little Confidence |

AR 1189, 2563 (emphasis added).

Minority Report

| Offeror | Adjectival Rating | Confidence Rating |
|---|---|---|
| DEVIS | Excellent | Significant Confidence |
| ISC | Acceptable | Confidence |
| Symplicity | Acceptable | Confidence |

*Id.*

Mitretek Report

| Offeror | Adjectival Rating | Confidence Rating |
|---|---|---|
| DEVIS | Excellent | N/A |
| ISC | Acceptable | N/A |
| Symplicity | Acceptable | N/A |

*Id.*

The new SSA's misperception of the technical ratings of ISC and Symplicity is even more apparent when the Majority Report's textual explanation is reviewed. *Compare* AR 774 (April 5, 2007 Final Technical Assessment Report Summary for ISC) ("ISC's proposal *can be expected* to produce a result that is very similar to the existing FBO. The new functionality . . . includes features that, while *improving the current FBO system*, are generally considered standard in contemporary web applications.") (emphasis added); *with* AR 813 (April 5, 2007 Final Technical Assessment Report Summary of Symplicity) ("Symplicity had proposed to build an application, install it on servers, keep the servers running, and answer the Help Desk phones. There is *little to no support* for outreach, training, or agency transition to a significantly different FBO. The *amount of resources* to adequately manage and provide transitions, maintenance, and support has been *grossly underestimated* . . . and presents a *significant risk of unsuccessful contract performance*.") (emphasis

added).[24] Therefore, contrary to the SSA's assertion, ISC's overall technical ratings and capabilities were superior to Symplicity's. *See* AR 1189-90, 2561.

The SSA's error tainted the "best value" analysis, because the trade off among price and non-cost factors was made assuming the offerors' technical ratings were ranked as follows:

DEVIS

ISC Symplicity

Instead, the new SSA should have conducted the "best value" analysis with the offerors ranked as follows:

DEVIS
ISC
Symplicity

In addition, the new SSA disregarded the Solicitation's directive to place significantly more weight on all technical evaluation factors than on price and "incentive plan" and, instead, accorded *equal or greater weight* on price. *Compare* AR 258 (RFP § M.2) (all "technical evaluation proposals, when combined, are *significantly* more important than price and incentive plan [factors].") *with* AR 2561-62 (Sept. 13, 2007 Source Selection Decision) ("A trade-off for the non-cost factors *does not justify DEVIS's price premium* whether compared to ISC or the Symplicity

---

[24] After the November 29, 2007 hearing, the Government proffered a Declaration of the CO, wherein the court was advised that since receiving the October 17, 2007 Notice to Proceed: "Simplicity has acquired hardware, software and has incurred costs associated with its FBO hosting sites." AR Tab 161 ¶ 5(a) (Nov. 29, 2007 Abood Decl.). In addition, "Symplicity has prepared development schedules and is preparing security paperwork. GSA is reviewing screens and processes developed by Symplicty. Symplicity is building librarian tables and is preparing for the incorporation of FedTeDs data into the FBO platform." *Id.* ¶ 5(b). For these services, GSA has paid Symplicity [deleted]. *Id.* ¶ 6. At a December 11, 2007 conference, DEVIS's counsel argued that: "This was a performance-based solicitation where the payments were tied to specific milestones of performance with respect to providing services to the government. Now it's been completely changed to a research development contract with advance payments that are made according to the spend rate of Symplicity . . . The payment terms have changed. And [Modification 2] has, among other things, a Section(g)(5) providing for monthly payment from the beginning of the contract, which was not in the RFP as bid." 12/11/07 TR at 15-16.

For the reasons discussed herein, the court did not consider it necessary to address issues regarding GSA's post-award decision to change the terms of payment. The fact that Symplicity required GSA to reimburse it for [deleted] for expenses incurred during the first five weeks of the contract, instead of the "milestone schedule for performance based payments tied to deliverables" set forth in the Solicitation (AR 254) and in Symplicity's proposed payment schedule (AR 2146), however, supports the Majority Report's expressed concern that the "amount of resources to adequately manage and provide transition . . . has been grossly underestimated." AR 813.

proposal . . . . The strengths of ISC's proposal do not outweigh the strengths, innovative approach, and lower price of the Symplicity proposal, and the Government *will not receive* [deleted] *in benefits* from ISC.") (emphasis added); 11/29/07 TR at 56-57 (DEVIS'S COUNSEL: "[T]his was supposed to be a procurement to procure a premium federal acquisitions system . . . . They converted this to a low cost procurement. That's the bottom line.").

Section C.3.3 of the Solicitation also requires that "[t]he offeror shall provide a system . . . that . . . [p]lan[s] for and accomplish[es] a *seamless* system transition from the current FBO system to the offeror's proposed FBO system[.]" AR 198-99 (emphasis added). The significant transition and staffing risks associated with Symplicity's proposal alone indicated that it failed to meet the minimum requirements necessary for selection here.[25] *See* AR 971 (April 6, 2005 Minority Report Technical Report: Symplicity) ("[S]taff sources explicitly assigned to activities associated with outreach and training appear inadequate for the level of activity proposed.") (emphasis in original).

For these reasons, the court has determined that the new SSA improperly re-evaluated ISC's and Symplicity's technical ratings, which tainted the "best value" analysis, and did not comply with the evaluation criteria set forth in the Solicitation in violation of FAR 15.101 and FAR 15.308. *See Banknote Corp.*, 365 F.3d at 1355 ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when . . . the contract is to . . . provide the agency with the best value. The issue here is whether the contracting officer acted within the *scope of that discretion*.") (emphasis added) (citations omitted); *see also Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("[T]he agency must examine the *relevant data* and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made . . . . In reviewing that explanation, we must consider whether the decision *was based on a consideration of the relevant factors* and whether there has been a *clear error of judgment*.") (emphasis added) (internal citation and quotation omitted). To the extent there is a conflict between the language of Section M.2 of the Solicitation, emphasizing the importance of the technical evaluation over both price and incentive plan factors (AR 258), with Section M.8 advising that FAR 15.101 permits a tradeoff of cost and non-cost factors that "allows the Government to accept other than the lowest price proposal or highest technical proposal" (AR 265), the conflict must be reconciled to favor the more specific instruction in Section M.2. *See Hills Materials Co.* v. *Rice*, 982 F.2d 514, 517 (1992) ("Where specific and general terms in a contract

---

[25] *Compare* AR 197 (RFP § C.1 ("Purpose")) ("Offerors are encouraged to propose creative, innovative solutions that deliver the required functionality without the constraints of the current system and *exceed cited requirements and capabilities so that the government may obtain the best value*.") (emphasis added) *with* AR 813 (April 5, 2005 Majority Technical Report: Symplicity) ("The amount of resources to adequately manage and provide transition, maintenance, and support has been *grossly underestimated* by Symplicity and presents a *significant risk* of unsuccessful contract performance.") (emphasis added) *and* AR 964 (April 6, 2005 Minority Report: Symplicity) ("*Based on the information provided and the interpretations and conclusions drawn, the minority opinion-holders believe the aggregate hours available are the absolute minimum to support Symplicity's planned approach. It is possible that they have understated their proposed hours*.") (emphasis in original).

are in conflict, those which relate to a particular matter control over the more general language.") (citation omitted); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 203(c) (1981) ("specific terms and exact terms are given greater weight than general language"); *Id.* § 202(1) ("[I]f the primary purpose of the parties is ascertainable it is given great weight."); AR 197 (RFP § C.1 ("Purpose")) (emphasizing importance of technical solutions) ("Offerors are encouraged to propose creative, *innovative solutions that deliver the required functionality* without the constraints of the current system and exceed cited requirements and capabilities so that the government may obtain the best value.") (emphasis added).

Both ISC and DEVIS were prejudiced by these errors. *See Bannum*, 404 F.3d at 1358 ("To establish prejudice [the plaintiff] was required to show that there was a 'substantial chance' it would have received the contract award but for . . . errors in the bid process."); *see also Statistica*, 102 F.3d at 1581 ("To establish competitive prejudice, a protestor must demonstrate that but for the alleged error, there was a '*substantial chance*' that [it] would receive an award-that is was within the zone of active consideration.") (internal citations omitted) (emphasis and alterations in the original). If the SSA had appropriately weighed technical ratings and risks in the Source Selection Decision, as required by the Solicitation, Symplicity likely would have been eliminated and ISC and DEVIS, as the two remaining offerors, would have had a "substantial chance" of winning the award. *See Bannum*, 404 F.3d at 1351.

**b. Complied With FAR 15.308, In Documenting The Exercise Of Independent Judgment.**

Since the new SSA's "best value" determination did not comply with FAR 15.101 and 15.308, the issue of whether he documented the exercise of independent judgment is moot. Nevertheless, the court has determined that this task was properly conducted.

**i. Plaintiff And Plaintiff-Intervenor's Arguments**.

ISC argues that the new SSA again failed to document any exercise of independent judgment in the revised Source Selection Decision, in violation of FAR 15.308. *See* Pl. Mem. II at 15-16 (citing 48 C.F.R. § 15.308) ("While the SSA may use reports and analyses prepared by others, the source selection shall represent the SSA's independent judgment."). ISC contends that the "3 ½ page Source Selection Decision prepared to support the re-selection of Symplicity . . . contains no evidence of independent judgment, particularly with regard to performance risk which was, as stated in the solicitation, equal in weight to all other technical factors." *See* Pl. PH Br. at 16. For example, the SSA failed to document any independent analysis with respect to Symplicity's underlying confidence ratings. *Id.* at 16-17 (citing AR 2560) (Sept. 13, 2007 Source Selection Decision). ISC also rejects the Government's argument that the SSA need only provide "some" evidence of his "independent analysis." *Id.* at 15.

DEVIS agrees that "[t]he [new] SSA has made the same mistake -- and committed the same FAR violation -- as made by the SSA in the previous protest" by increasing Symplicity's rating from technically "Unacceptable" and having "Little Confidence," based on "the mere acceptance of and agreement with the Minority Report's analysis[,] without any 'independent rationale for that agreement.'" Int. Mem. II at 19. DEVIS concedes that the new SSA's explanation "is longer than

the one-sentence decision at issue in the previous protest," but the new "six sentences . . . are wholly conclusory – they merely repeat the conclusions stated in 'reports and analyses prepared by others' or they state the SSA's own conclusions." *Id.* at 20 ("[T]he first and second sentences simply recount that the SSA read the Minority and Mitretek reports and found them to be 'consistent.' The remainder of the paragraph contains a series of further conclusions without any analysis whatsoever."). Therefore, DEVIS rejects the Government's argument that the SSA's decision "must stand on its own," and that the court's intention to compare the September 13, 2007 Source Selection Decision with the June 16, 2005 Source Selection Decision "contradict[s] the Court's prior order." Pl. Int. PH Br. at 18-19.

DEVIS analyzes the "best value" determination line-by-line[26] and concludes that it "contains no comparison of the merits of the DEVIS and Symplicity proposals, other than to acknowledge that DEVIS's proposal is 'technically superior.'" *Id.* (citing AR 2561). Although the new SSA determined that DEVIS's proposal is not worth the extra-cost, "he has evidently not conducted any analysis to support that conclusion, nor . . . stated his reasoning in making that decision." *Id.* at 26. Accordingly, "the [new] SSA [also] has failed to state the 'the rationale for any business judgments and tradeoffs made or relied on by the SSA' as required by FAR 15.308[, and] the SSA failed to cite any consideration of the 'benefits associated with additional costs.'" *Id.* at 26.

**ii. The Government And Defendant-Intervenor's Responses.**

The Government responds that the new SSA's Source Selection Decision documents the exercise of independent judgment. *See* Gov't Resp. II at 17; *see also* 48 C.F.R. § 15.308 ("Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision."). In *Information Sciences II*, the court held that the "[t]he absence of any analysis evidencing the exercise of 'independent judgment' violated FAR 15.308" in the prior Source Selection Decision, and "simply re-stated the findings of the Minority and Majority reports." *Info. Scis. II*, 75 Fed. Cl. at 410. Moreover, the court found that "[a]t no place . . . did the SSA provide any independent analysis or rationale for endorsing the Minority Report's conclusions or how it considered and balanced/weighed the Majority Report. The absence of any analysis evidencing the exercise of 'independent judgment' violates FAR 15.308."). Now, the new SSA "has sufficiently documented every aspect of his decision process." Gov't Resp. II at 18 (citing AR 2559-64); *see also id.* at 19 (citing AR 2559) (Sept. 13, 2007 Source Selection Decision).

---

[26] The first two sentences "merely recite known facts: that DEVIS's proposal is 'technically superior' but more expensive than other proposals." Int. Mem. II at 25 (citing AR 2561). DEVIS characterizes the third sentence as "a conclusion . . . [that] is not a cost-technical tradeoff analysis [but] the conclusion of such an analysis." *Id.* The fourth sentence "merely recounts a list of some of the many strengths of the DEVIS proposal: 'early implementation, hardware architecture, data archival strategy, software architecture, functionality, transition planning, management and key personnel.'" *Id.* Finally, "[n]one of the remaining three sentences in the paragraph rejecting DEVIS's proposal contain any cost-technical tradeoff analysis" but instead "are conclusions." *Id.* at 25-26.

The Government further argues that DEVIS is asking the court to "deconstruct" an excerpt of the SSA's decision and "demand[] that the SSA include a tradeoff in every sentence." Gov't Resp. II at 24-25 (citing Int. Mem. II at 24). Instead of engaging in "microscopic parsing," the court should review the SSA's decision "as a whole." *Id*. at 20 (citing *Info. Scis. I*, 73 Fed. Cl. at 118 n.36 (quoting *Ryder Move Mgmt*. v. *United States*, 48 Fed. Cl. 380, 388 (2001) ("[T]he court may consider 'the record as a whole, [in determining whether] the [SSA's] conclusion . . . was rational and supported.'")). The SSA "clearly documented" the "business judgments" made in awarding the contract to Symplicity, and the tradeoff was the product of comparing the strengths of ISC's and DEVIS's proposals against their and Symplicity's price. *Id*. at 25. In doing so, the SSA "reasonably concluded that the advantages of the [ISC and DEVIS] proposals did not merit the additional [deleted] and [deleted] premium, respectively, over Symplicity." *Id*. (citing AR 2561-62) ("Hence, the core business judgment traded the strengths of the ISC and DEVIS proposals for a cost savings of [deleted] and [deleted], respectively."). In sum, "[t]his type of tradeoff is the essence of a best value procurement to determine whether a given proposal is worth its cost[.]" *Id*.; *see also* Def. Int PH Br. at 21-22 (citing AR 2559-63).

Because the SSA complied with the court's orders in *Information Sciences I* and the FAR, the Government is "entitled to a 'presumption of regularity' which, in the absence of clear evidence to the contrary, presumes that public officers have properly discharged their official duties." *See* Gov't Resp. II at 21. The court only instructed the Government to issue a new Source Selection Decision, not "build" on the previous decision. *See* Gov't PH Br. at 26-27; *see also Banknote Corp*., 365 F.3d at 1355 (It is "well established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the best value [to the government.]") (citations omitted); *Risc Mgmt. Joint Venture* v. *United States*, 69 Fed. Cl. 624, 636 (2006) (Plaintiff bears a "significant burden of showing error . . . because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors.").

**iii. The Court's Resolution.**

FAR 15.308 provides, in relevant part, that "[w]hile the SSA may use reports and analyses prepared by others, *the source selection decision shall represent the SSA's independent judgment*[,] [t]he source selection decision shall be documented, and *the documentation shall include the rationale for any business judgments and tradeoffs made or relied on* by the SSA, including benefits associated with additional costs." 48 C.F.R. § 15.308 (emphasis added).

In *Information Sciences I*, the court determined that the May 26, 2005 SSA Decision did not evidence that the SSA exercised independent judgment in raising Symplicity's rating from "Unacceptable" to "Acceptable," and ISC's rating from "Marginal" to "Acceptable." *See Info. Scis. I*, 73 Fed. Cl. at 120 (raising the technical ratings of Symplicity and ISC was preceded only by a six page summary of the Majority and Minority technical findings); *see also id.* (citing AR 1037-45) (May 26, 2005 SSA Determination To Raise Ratings) ("The details below are the *responses of the minority report* to areas that the majority report cited as reasons for the low technical score.") (emphasis added); AR 1045 ("The SSA, after a review of the minority opinion report and the independent technical advisor's report, agrees with the minority reports and their criticisms of the

Majority report, and that the proposals received from ISC Corporation and Symplicity Corporation be considered acceptable."). The court further explained that the SSA:

> could have met the FAR requirement by stating: I agree with the Minority Report *because of reasons X, Y, Z*. Instead, the SSA wrote, 'The SSA . . . agrees with the minority reports, and that the proposals received from ISC Corporation and Symplicity Corporation be considered acceptable.' The SSA's reasons for relying on the Minority Report, are not documented in the Administrative Record. Therefore, the court has determined that the SSA violated FAR 15.308.

*Info. Scis. I*, 73 Fed. Cl. at 121 (emphasis in original).

The new SSA, however, documented the exercise of independent judgment in construing each offeror's overall ratings and making the "best value" determination, by explaining why he rated Symplicity's proposal "Acceptable" with "Confidence," adopting the Minority Report ratings instead of those of the Majority Report:

> The Symplicity proposal was judged technically "Unacceptable" with "Little Confidence" by the Majority, "Acceptable" with "Confidence" by the Minority, and "Acceptable" by the independent Mitretek advisor. Also, the consensus among the entire evaluation panel was that the Symplicity proposal was "Acceptable" in the factors of Management, Past Performance, and Key Personnel. The *Symplicity proposal has a number of strengths* that are important to the government as evidenced in the RFP. *For example*, Symplicity proposed a very innovative approach making use of unique hardware and network architectures, the SympleObjects application framework, valuable enhancements, a comprehensive description of program functionality, a web-accessible project management and issue tracking system, and seamless transition plan.
>
> *With respect to weaknesses*, Symplicity proposed minimal staffing including minimally sufficient hours of outreach, training and maintenance or government certification and accreditation, and proposed reporting not scheduled at initial system implementation. The Majority also noted a number of other weaknesses in the Symplicity proposal.
>
> I have carefully reviewed the strengths and weaknesses of the Symplicity proposal identified by the evaluators and the responses to identified weaknesses in the Minority report. *The Minority and Mitretek reports are consistent* with respect to strengths and weakness and their ultimate rating of "Acceptable." *In particular*, the Minority and Mitretek comments on the level of staffing proposed by Symplicity *leads me to conclude* that Symplicity has in fact proposed sufficient staffing and hours to meet the objectives in the RFP. The *strengths of the Symplicity proposal more than outweigh* any remaining identified weaknesses in the proposal. It is *my judgment* that the Minority and Mitretek assessments [are] more accurate, and should

> be given more weight than the Majority evaluation. Therefore, *it is my judgment* that the Symplicity proposal is "Acceptable" with "Confidence."

*See* AR 2560-61 (Sept. 13, 2007 Source Selection Decision) (emphasis added).

In addition, the court has determined that the new SSA documented the exercise of independent judgment in his findings with respect to ISC's and DEVIS's technical proposals. *See* AR 2560 (Sept. 13, 2007 Source Selection Decision) ("*Because* the Minority and Mitretek reports are consistent with respect to the rating of "Acceptable" and are *more focused on the* [*G*]*overnment's needs* as reflected in the RFP requirements, *it is my judgment* that the Minority and Mitretek reports more accurately assess ISC's proposal.") (emphasis added).

Finally, the court has determined that the new SSA documented the exercise of independent judgment in rendering the "best value" determination. *See* AR 2561 ("A trade-off for the non-cost factors does not justify the price premium whether compared to the ISC or the Symplicity proposal. *For these reasons*, DEVIS's proposal does not represent the best value to the [G]overnment.") (emphasis added); *see also* AR 2561-62 ("As part of the trade-off analysis, the strengths of ISC's proposal, including its experience as the incumbent subcontractor, a proposal for early implementation, strong interagency coordination, plans for maintaining existing and familiar interfaces, partnering with IMSI for certification and accreditation process, maximizing return on investment in the current FBO, understanding of issues associated with the software development life cycle, approach to delivering software, management and key personnel were reviewed. However, *in my judgment*, the technical *strengths* of ISC's proposal are *not worth* an additional [deleted].") (emphasis added).

FAR 15.308 requires a documented independent analysis that, in this case, now has been satisfied. *See* Court Appendix (comparing the prior and reconsidered Source Selection Decisions); *see also Ryder Move Mgmt.*, 48 Fed. Cl. at 388 (the court reviews "the record as a whole" in determining whether the SSA's conclusions are "rational and supported"). Accordingly, the court has determined that the SSA satisfied the second and third requirements of FAR 15.308, because the September 13, 2007 Source Selection Decision documented the exercise of independent judgment for the business judgments and tradeoffs made. *See Info. Scis. I*, 73 Fed. Cl. at 118.

### F. Plaintiff And Plaintiff-Intervenor Are Entitled To Injunctive Relief.

#### 1. Governing Precedent Regarding Relief In Bid Protest Cases.

To afford relief in a bid protest action, the United States Court of Federal Claims "may award *any* relief that the court considers proper, *including* declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2) (emphasis added); *see also LABAT-Anderson, Inc.* v. *United States*, 65 Fed. Cl. 570, 576 (2005). The United States Court of Appeals for the Federal Circuit, however, has held that the court is not required to enjoin arbitrary, capricious, or otherwise unlawful contract awards. *See PGBA*, 389 F.3d at1226 ("We thus hold that, in a bid protest action, [28 U.S.C. §] 1491(b)(4) does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award."). The court analyzes four factors in determining whether to grant injunctive relief: "(1) immediate and

irreparable injury to the movant; (2) the movant's likelihood of success on the merits; (3) the public interest; and (4) the balance of hardship on all the parties." *U.S. Ass'n of Importers of Textiles & Apparel* v. *United States*, 413 F.3d 1344, 1346 (Fed. Cir. 2005) (citing *Zenith Radio Corp*. v. *United States*, 710 F.2d 806, 809 (Fed. Cir. 1983)). None of these individual factors is determinative and "the weakness of . . . one factor may be overborne by the strength of the others." *FMC Corp.* v. *United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

**2. The Requested Relief In This Case**

ISC's Amended Complaint requests the following relief:

> (a) Enjoining Defendant from performance under Solicitation Number TQN-04-RA-0001, or any other solicitation for the same project;
>
> (b) Enjoining Defendant from proceeding with the subject procurement until it properly evaluates ISC's and Symplicity's proposal consistent with the terms of the Solicitation and the applicable procurement laws including the holding of meaningful discussions after the proper establishment of a competitive range;
>
> (c) Awarding a contract to the offeror submitting the proposal that represents the best value to the government consistent with the terms of the Solicitation; and
>
> (d) Awarding ISC such other and further relief as this court may deem necessary and proper.

*See* Sec. Am. Compl. at 15.

DEVIS requests that:

> [T]he Court should set aside the agency's unlawful and irrational procurement action and should direct the agency to undertake appropriate corrective action, including the elimination of Symplicity's proposal from consideration and a comprehensive review and independent determination by the SSA regarding whether the DEVIS proposal or the ISC proposal represents the "Best Value" to the government.

Int. Mot. II ¶ 4, at 3.

**3. The Court's Resolution.**

**a. Plaintiff And Plaintiff-Intervenor Have Demonstrated Success On The Merits As To The "Best Value" Determination.**

ISC claims that the SSA failed appropriately to evaluate Symplicity's and ISC's technical proposals, resulting in an improper "best value" decision. *See* Pl. Mem. II at 15 ("The SSA Violated FAR 15.308 By . . . Making An Award Decision Inconsistent With The Solicitation's Evaluation Factors[.]"); *see also* Pl. PH Br. at 22 ("ISC has demonstrated above the likelihood of success on the

merits based on GSA's . . . improper best value analysis."). Similarly, DEVIS argues that the SSA failed to apply the cost-technical trade-off criteria in his source selection decision. *See* Int. Mem. II at 26 ("However, the SSA never recognized or applied the critical substantive evaluation factors set forth in the RFP, especially the most critical factor of all: [technical factors.]"). The Government asserts that "neither ISC nor Devis has established a likelihood of success on the merits," because "the reconsideration of the competitive range and the source selection decision conform to the solicitation, applicable regulation, and the Court's prior decisions." Gov't Resp. II at 32.

The court has determined that the new SSA violated FAR 15.101 and FAR 15.308 in failing to follow the evaluation factors set forth in the Solicitation, and therefore the Source Selection Decision was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"). Accordingly, ISC and DEVIS have demonstrated success on the merits.

**b. Plaintiff And Plaintiff-Intervenor Have Established Irreparable Harm, If Injunctive Relief Is Not Granted.**

The second factor in considering the appropriateness of injunctive relief is whether the plaintiff will suffer irreparable harm. *See PGBA*, 389 F.3d at 1229. In assessing this factor, "the relevant inquiry is whether the protestor has an adequate remedy in the absence of an injunction." *OTI Am., Inc.* v. *United States*, 68 Fed. Cl. 646, 659 (2005) (quoting *PGBA*, 60 Fed. Cl. at 221, *aff'd*, 389 F.3d 1219 (2004)).

The United States Court of Federal Claims has held that a protester suffers irreparable injury when it has been deprived of the opportunity to compete fairly for a contract. *See Cardinal Maint. Serv., Inc.* v. *United States*, 63 Fed. Cl. 98, 110 (2004) ("It is well-settled that a party suffers irreparable injury when it loses the opportunity to compete on a level playing field with other bidders . . . . Irreparable injury includes, but is not limited to, lost profits which would flow from the contract.") (citing *Hunt Bldg. Co.* v. *United States*, 61 Fed. Cl. 243, 280 (2004) (The awardee "will be harmed by having to undergo a recompetition-but not as severely as [the losing bidder] would be, if the unfair selection were allowed to stand." The awardee "will still be able to compete, this time on equal footing . . . whereas absent injunctive relief, [the losing bidder] will have been unfairly denied a meaningful opportunity to compete. On balance, injunctive relief is warranted to remedy the unfair process here.")); *see also SAI Indus.* v. *United States*, 60 Fed. Cl. 731, 747 (2004) ("Irreparable injury can be shown in the 'form of lost opportunity to fairly compete for and perform work under the contract, including but not limited to lost profits that would generate therefrom.'") (quoting *Metcalf Constr.*, 53 Fed. Cl. at 645).

ISC contends the Government's errors in this procurement satisfy the irreparable harm element. *See* Pl. Mem. II at 25 ("These failures have prejudiced ISC by denying it the opportunity to secure the FBO contract and the resulting profits. This type of injury has been recognized as being significant enough to constitute irreparable harm."). Similarly, DEVIS argues that "[i]n this case, monetary relief would not adequately compensate DEVIS for its lost opportunity to fairly compete

for the FedBizOpps contract and, therefore, DEVIS does not have an adequate remedy other than injunctive relief." Int. Mem. II at 41-42 (citing *SAI Indus.*, 60 Fed. Cl. at 747).

The Government intended to award a three-year fixed-price incentive contract with the potential for an additional five option years. *See* AR 196, 206. The Solicitation asked offerors "to propose creative, innovative, solutions," and ISC and DEVIS's Proposals identify several optional enhancements, the unique features of which make it difficult for the court to quantify the potential profit that each offeror expected to earn during the term of the contract. Nevertheless, ISC and DEVIS have committed substantial resources to challenge this procurement. Although a monetary award might compensate ISC and DEVIS for these efforts, in part, the denial of injunctive relief would foreclose their opportunity to compete fairly and equally for this significant contract.

**c. In This Case, The Balance Of The Hardships Weighs In Favor Of Injunctive Relief.**

The third factor is whether the balance of hardships to the respective parties favors granting injunctive relief. *See PGBA*, 389 F.3d at 1229. ISC argues injunctive relief would not harm third parties, because "the current Fedbizopps system continues to serve the public and the Government as it has for over a year since this court's initial decision." *See* Pl. Mem. II at 26 ("The balance of hardships weighs in ISC's favor because if Symplicity is enjoined from performing pending this litigation, the government still possesses an operational Fedbizopps system run by ISC."). DEVIS argues that the Government "will not be harmed by such an injunction, as it is undisputed that the FedBizOpps is still operating without interruption." Int. Mem. II at 42 (citing *Info. Scis. I*, 73 Fed. Cl. at 128).

The Government, however, maintains that:

> When balancing the hardships to the parties, the Court should also consider that (1) as the Incumbent contractor, ISC has benefitted financially from the repeated sole-source extensions of its contract that have been necessitated by the length of the procurement process; (2) the Government and the contracting community at large deserve better than ISC's current system that, because of its age, has become obsolete and cumbersome compared to state of the art web-based systems; (3) the prohibitively high price of DEVIS' proposal, which placed it third in the best value hierarchy, renders an award unlikely and, in any event, not in the interest of the Government or taxpayers; and (4) Symplicity has already commenced performance of the FBO contract and made significant financial investments in the new FBO system.

Gov't Resp. II at 32.

Symplicity adds that the harm an injunction would cause Symplicity, which is already performing under the contract, and the Government, which is dependent upon a functioning FedBizOpps system, outweighs the harm of a denial of an injunction, "because Government

resources have already been expended in this matter on both defending the choice of Symplicity and in attempting to start a fresh contract[.]" Def. Int. PH Br. at 27.

The court has determined that a balance of the hardships favors the grant of limited injunctive relief. In truth, although Symplicity's system may be operational and submitted for Government testing (*see* AR Tab 167 ¶ 3 (Feb. 23, 2008 Friedler Aff.)), even the Government concedes that ISC is still running the FBO system, and Symplicity will not take over until March 30, 2008. *See* Gov't Resp. Pl. PH Br. at 5 ("The current GSA contract is not with ISC but, more accurately, with SAIC as ISC's prime contractor. The contract by its terms expires March 30, 2008 . . . . GSA has selected Symplicity to serve as the contractor on or before March 30[.]"). The court is also aware that GSA has spent a substantial sum to facilitate Symplicity's transition. *See* AR Tab 161 ¶ 5 (Nov. 29, 2007 Abood Decl.) ("GSA has paid Symplicity [deleted] to date for their work on the contract."). The Government, however, has been aware, at least since the November 29, 2007 hearing, that any expenditures made while this bid protest was pending would be made at GSA's peril. *See* 11/29/07 TR at 168. Although an injunction would delay GSA's effort "to acquire a contractor for comprehensive development, implementation, transition, operations[,] and support of a new Federal Business Opportunities (FBO) system (*see* AR 89), GSA has not indicated that a further delay in awarding the contract would threaten the continued operation of that FBO system, even if it may delay some enhancements. *See* Gov't PH Br. at 28 ("[A]nother delay of performance will further deprive the Government and the contracting community at large of an *enhanced* FBO system[.]") (emphasis added). In sum, the additional time and expense involved in requiring GSA to solicit and award the FBO contract is outweighed by the importance of this procurement being conducted in compliance with the law.

**d. In This Case, The Public Interest Weighs In Favor Of Injunctive Relief.**

The final factor is whether injunctive relief is in the public interest. *See PGBA*, 389 F.3d at 1229. The United States Court of Federal Claims has held that "[i]t is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations." *See LABAT*, 65 Fed. Cl. at 581 (citations omitted).

ISC argues that "the issuance of an injunction will preserve the status quo and protect both the plaintiff's and the public's interest in the integrity of the procurement system." *See* Pl. Mem. II at 26. DEVIS concurs. Int. Mem. II at 37. Symplicity counters that it is in the public interest to allow the award to stand, because Symplicity's development of the "innovative, new" FBO system is "at significant cost savings to the Government which is the result of the proper selection of Symplicity for award." *See* Def. Int. PH Br. at 28 ("It is a fair assumption that should this Court grant the relief requested and either DEVIS or ISC prevail in a subsequent source selection decision, then a fourth, fifth or sixth protest will surely follow.").

These concerns are outweighed by the public interest of ensuring that the ultimate awardee offers the "best value" to the Government, pursuant to the terms of the Solicitation and applicable procurement regulations. *See LABAT,* 65 Fed. Cl. at 581; *see also Hunt Bldg.*, 61 Fed. Cl. at 280

("Plaintiff has shown that granting a permanent injunction will serve the public interest by ensuring that the selection process under this Solicitation is conducted fairly [and] public confidence in that process will be preserved.") (citations omitted); *SAI Indus.*, 60 Fed. Cl. at 747 ("The public's interest is clearly served when suppliers engage in fair and robust competition for government contracts.") (citing *Metcalf Constr.*, 53 Fed. Cl. at 645); *Al Ghanim Combined Group Co. Gen. Trade & Cont. W.L.L.* v. *United States*, 56 Fed. Cl. 502, 521 (2003) ("[T]he public interest is served by enforcing a procurement process that conforms with regulatory authority and the solicitation's evaluation criteria.") (citing *Essex Electro Eng'rs, Inc.* v. *United States*, 3 Cl. Ct. 277, 288 (1983)).

One additional consideration is that GSA identified and made significant modifications to the FBO Contract within six weeks after the re-award. *See* AR Tab 160 (Nov. 8, 2007 "PS02" Modification of Contract GSOOT05NSC0005), AR Tab 164 (Dec. 14, 2007 "PS03" Modification of Contract GSOOT05NSC0005), AR Tab 166 (Feb. 8, 2008 "PS04" Modification of Contract No. GSOOT05NSC0005). Although GSA revoked Modification 2 when the court became aware of this action, it may be that [deleted] will result in an FBO Contract that will provide GSA and the public with the "best value." The court discerns no reason why GSA cannot issue a revised Solicitation and award an FBO Contract that fully complies with the Solicitation and all applicable provisions.

GSA's leadership has stated that:

> GSA customers know when they use GSA contract vehicles they get the best value in price and service. With the "Get It Right" plan, these customers are being reassured that, along with the best prices and value, they are using a procurement system that is managed with the highest standards of ethics, effectiveness, and efficiency available.

GSA, *Confidence in Contracting* (July 13, 2004) (quoting GSA Administrator Stephen A. Perry);[27] *see also* Statement of Emily W. Murphy, GSA Chief Acquisition Officer, S. Com. Homeland Sec'y & Gov't Affairs, Subcomm. Fed. Fin. Mgmt., Gov't Info. & Int'l Sec'y (July 26, 2005) ("GSA's mission and achievements are very important to the efficiency and effectiveness of the Federal government, and that we make a difference in the process of delivering good government services, and to the well-being of people who live in this country . . . . GSA is the premier acquisition agency of the Federal government[.]").[28]

The court is confident that GSA can "Get It Right" by re-issuing a revised Solicitation, and awarding the FBO Contract in a manner that complies with the procedural and substantive requirements of the FAR, as soon as possible.

---

[27] *See* http://www.gsa. gov/Portal/gsa/ep/contentView.do?pageTypeId=8169&channelId= -13260&P=XAE&contentId=16341&contentType=GSA_BASIC

[28] *See* http://www.gsa.gov/Portal/gsa/ep/contentView.do?contentType=GSA_BASIC& contentId=19320&noc=T

## IV. CONCLUSION.

For the aforementioned reasons, ISC's Motion For Judgment On The Administrative Record and DEVIS's Motion For Judgment On The Administrative Record are hereby granted, in part.

GSA's September 28, 2007 re-award of FBO Contract No. GSOOT05NSC0005 is set aside.

GSA is ordered to issue a revised Solicitation and award the FBO Contract as soon as possible.

ISC's December 7, 2007 and January 14, 2008 Motions are denied as moot. DEVIS's December 20, 2007 Motion and the Government's March 17, 2008 Motion To Unseal The Proposed Redactions to this Memorandum Opinion and Order are denied, in light of the fact that the GSA may decide to issue a new Solicitation.

The Clerk of the United States Court of Federal Claims is DIRECTED to enter judgment in accordance with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

**s/ Susan G. Braden**
**SUSAN G. BRADEN**
**Judge**

**COURT APPENDIX:**
**COMPARISON OF THE PRIOR MAY 26, 2005 AND JUNE 16, 2005 SOURCE SELECTION DECISION WITH THE SEPTEMBER 13, 2007 NEW SOURCE SELECTION DECISION**

| | Source Selection Decision: May 26, 2005 And June 16, 2005 (AR 1037-1107) | New Source Selection Decision: September 13, 2007 (AR 2559-2564) |
|---|---|---|
| Findings Regarding DEVIS's Proposal | "The Devis' proposal, although given a technical adjectival rating of 'Excellent,' also had the second highest price of [deleted]." | "Devis was the only technical proposal where there was a consensus of excellent or acceptable on all evaluation factors. Among Devis' strengths are technical software and hardware architecture, data archival strategy, features and functionality, understanding of the issues, and transition plan. The Majority, Minority, and Mitretek evaluations judged the Devis proposal to be technically superior to the other three proposals in the competitive range. In fact, the Devis proposal was uniformly rated 'Excellent' with 'Significant Confidence.' However, both the Minority and Mitretek evaluations noted a number of weaknesses and disadvantages associated with the Devis proposal. With respect to the price of the Devis proposal, the contracting officer has previously determined that Devis' evaluated price should be reduced by [deleted], from [deleted] to [deleted] because of a benefit of an early implementation. Devis has never challenged this adjustment and I find the adjustment reasonable." |
| Findings Regarding ISC's Proposal | "The SSA, after a review of the minority opinion reports and the independent technical advisor's assessment, agrees with the minority reports and their criticisms of the majority report, and that proposals received from | "ISC's proposal was rated 'Marginal' with 'Confidence' by the Majority, 'Acceptable' with 'Confidence' by the Minority, and 'Acceptable' by the independent Mitretek evaluator. The Majority report found that ISC made its enhancement supports optional and |

| | Source Selection Decision: May 26, 2005 And June 16, 2005 (AR 1037-1107) | New Source Selection Decision: September 13, 2007 (AR 2559-2564) |
|---|---|---|
| | *ISC Corporation* and *Symplicity Corporation* be considered acceptable." | that this rendered ISC's technical and business proposals inconsistent. The Majority report also found that ISC's proposal was limited with respect to innovation, that there was an absence of user training, and that ISC did not propose an application server, and that the ISC proposal was unclear and vague in certain respects. The Majority identified a number of other weaknesses as well.<br><br>In contrast, the Minority report responded to, and in many cases discounted, the weaknesses identified by the Majority. The Independent report found weaknesses with the ISC proposal but concluded that the proposal was nonetheless 'Acceptable.' I have carefully reviewed the strengths and weaknesses of the ISC proposal identified by all evaluators. Because the Minority and Mitretek reports are consistent with respect to the rating of 'Acceptable' and are more focused on the governments needs as reflected in the RFP requirements, it is my judgment that the Minority and Mitretek reports more accurately assess the ISC proposal. Therefore, I determine that the ISC proposal is 'Acceptable' with 'Confidence.'<br><br>With respect to the price of the ISC proposal, the contracting officer has previously determined that ISC's evaluated price should be reduced by [deleted], from [deleted] to [deleted] because of the benefits of early |

| | Source Selection Decision: May 26, 2005 And June 16, 2005 (AR 1037-1107) | New Source Selection Decision: September 13, 2007 (AR 2559-2564) |
|---|---|---|
| | | implementation. ISC has never challenged this adjustment, I find this adjustment reasonable.” |
| Findings Regarding Symplicity’s Proposal | “The SSA, after a review of the minority opinion reports and the independent technical advisor’s assessment, agrees with the minority reports and their criticisms of the majority report, and that proposals received from *ISC Corporation* and *Symplicity Corporation* be considered acceptable.” | “The Symplicity Proposal was judged technically ‘Unacceptable’ with ‘Little Confidence’ by the Majority, ‘Acceptable’ with ‘Confidence’ by the Minority, and ‘Acceptable’ by the independent Mitretek advisor. Also, the consensus among the entire evaluation panel was that the Symplicity proposal was ‘Acceptable’ in the factors of Management, Past Performance, and Key Personnel. The Symplicity proposal has a number of strengths that are important to the Government as evidenced by the RFP. For example, Symplicity proposed a very innovative approach making use of unique hardware and network architectures, the SympleObjects application framework, valuable enhancements, a comprehensive description of program functionality, a web-accessible project management and issue tracking system, and seamless transition plan.<br><br>With respect to weaknesses, Symplicity proposed minimal staffing including minimally sufficient hours for outreach, training and maintenance of government certification and accreditation, and proposed reporting not scheduled at initial system implementation. The Majority also noted a number of other weaknesses in the Symplicity proposal. |

| | Source Selection Decision: May 26, 2005 And June 16, 2005 (AR 1037-1107) | New Source Selection Decision: September 13, 2007 (AR 2559-2564) |
|---|---|---|
| | | I have carefully reviewed the strengths and weaknesses of the Symplicity proposal identified by the evaluators and the responses to identified weaknesses in the Minority report. The Minority and Mitretek reports are consistent with respect to strengths and weakness and their ultimate rating of 'Acceptable.' In particular, the Minority and Mitretek comments on the level of staffing proposed by Symplicity leads me to conclude that Symplicity has in fact proposed sufficient staffing and hours to meet-the objectives in the RFP. The strengths of the Symplicity proposal more than outweigh any remaining identified weaknesses in the proposal. It is my judgment that the Minority and Mitretek assessments more accurate, and should be given more weight than the Majority evaluation. Therefore, it is my judgment that the Symplicity proposal is 'Acceptable' with 'Confidence.'" |
| Finding To Eliminate DEVIS' Proposal From Consideration For Award. | "For Devis, it is determined that the savings associated with its proposed earlier transition ([deleted]) (total evaluated price of [deleted]), and other perceived benefits of its higher priced proposal does not offset the lowest priced, technically 'acceptable' offer from Symplicity.<br><br>The perceived benefits of the other offers do not outweigh the strengths, acceptability and lowest price ([deleted]) of the | "As discussed above, the Devis proposal is technically superior to the other proposals in the competitive range. However, the price of the Devis proposal is [deleted] more than ISC and [deleted] more than Symplicity. The value to the government of the strengths of Devis' proposal does not warrant the price differential when compared to the other offerors. As part of the trade-off analysis, the strengths of the Devis proposal, which included early implementation, hardware architecture, data archival strategy, |

| | Source Selection Decision: May 26, 2005 And June 16, 2005 (AR 1037-1107) | New Source Selection Decision: September 13, 2007 (AR 2559-2564) |
|---|---|---|
| | Symplicity Corporation proposal, and the Government will not receive . . . [deleted] (includes estimated savings of [deleted] for early implementation) in benefits from . . . Devis Corporation[.]" | software architecture, functionality, transition planning, management and key personnel were found to be attractive. However, in my judgment, there is no reasonable basis for spending an additional [deleted], much less an additional [deleted], for the technical strengths of the Devis proposal. A trade-off for the non-cost factors does not justify the price premium whether compared to the ISC or the Symplicity proposal. For these reasons, the Devis proposal does not represent the best value to the government." |
| Finding To Eliminate ISC Proposal From Consideration For Award, And To Award To Symplicity. | "ISC and Symplicity both received similar technical adjectival ratings of 'Acceptable', so according to the RFP, provision M.2, the price analysis took on more importance. However, ISC's proposed price of [deleted], and the savings of [deleted] associated with early implementation (total evaluated price of [deleted]), along with other perceived benefits of its higher priced proposal, does not offset the lowest priced, technically 'acceptable' offer from Symplicity.<br><br>Because of the substantial price differences between offers, the perceived benefits of higher priced proposals will not offset the lowest priced offer, and it is concluded that the government only consider award to the | "The ISC proposal, which demonstrated strength in all four evaluation factors (as discussed above), and having received a technical adjectival rating of 'Acceptable' with 'Confidence,' had a proposed price of [deleted]. The ISC evaluated price is [deleted] includes a savings of [deleted] for early implementation. In my judgment, the ISC proposal does not warrant a [deleted] price difference when compared to the similarly-rated Symplicity's proposal.<br><br>As part of the trade-off analysis, the strengths of the ISC proposal, including its experience as the incumbent subcontractor, a proposal for early implementation, strong interagency coordination, plans for maintaining existing and familiar interfaces, partnering with IMSI for certification and accreditation process, maximizing return on investment in |

| | Source Selection Decision: May 26, 2005 And June 16, 2005 (AR 1037-1107) | New Source Selection Decision: September 13, 2007 (AR 2559-2564) |
|---|---|---|
| | lowest priced, technically acceptable offer. The perceived benefits of the other offers do not outweigh the strengths, acceptability and lowest price ([deleted]) of the Symplicity Corporation proposal, and the Government will not receive [deleted] (includes estimated savings of [deleted] for early implementation) . . . in benefits from ISC Corporation[.]” | the current FBO, understanding of issues associated with the software development life cycle, approach to delivering software, management and key personnel were reviewed. However, in my judgment, the technical strengths of the ISC proposal are not worth an additional [deleted].<br><br>Symplicity offers an innovative and qualitatively comparable technical solution that fulfills the Government's requirements at a significantly lower price. Because of the substantial price difference between offers, the benefits of the ISC proposal do not offset Symplicity’s lower priced offer. The strengths of the ISC proposal do not outweigh the strengths, innovative approach, and lower price of the Symplicity proposal, and the Government will not receive [deleted] in benefits from ISC.” |